FIFTH DIVISION

No. 1-08-0981

| | | |
|---|---|---|
| *In re* M.W., a Minor, | ) | |
| | ) | Appeal from the |
| Respondent-Appellant | ) | Circuit Court of |
| | ) | Cook County |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | Honorable |
| | ) | Maxwell Griffin, Jr., |
| Lori B. and Darrion W., | ) | Judge Presiding. |
| | ) | |
| Respondents-Appellees). | ) | |
| | ) | |

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

At an adjudicatory hearing, the circuit court found M.W., the son of respondents Lori B. and Darrion W., neglected due to an injurious environment. At a subsequent disposition hearing, the court found, *inter alia*, Lori B. fit, willing and able to care for and protect M.W.

The Office of the Cook County Public Guardian (Public Guardian) and the State's Attorney of Cook County appeal, contending that (1) the State met its burden to establish that M.W. was abused due to a substantial risk of physical injury; and (2) the circuit court's ruling that Lori B. was fit, willing and able to care for and protect M.W. was against the manifest weight of the evidence.

For the reasons that follow, we affirm the trial court's adjudicatory hearing order but reverse its disposition hearing order that found Lori B. fit, willing and able to parent M.W.

1-08-0981

## I. BACKGROUND

Respondent Lori B. is the mother of D.J., who was born in April 2004, and M.W., who was born in September 2007. Respondent Darrion W. is the father of M.W. This appeal concerns the adjudication and disposition only of M.W. However, because M.W.'s involvement with the Department of Children and Family Services (DCFS) arose from his half brother D.J.'s adjudication of abuse and neglect, we briefly summarize that matter. See also In re D.J., No. 1-05-3815 (April 21, 2006) (unpublished order under Supreme Court Rule 23).

### A. The Neglect and Abuse of D.J.

In January 2005, Lori B. began a relationship with her paramour, Shawn Patterson. In May 2005, she left the home she shared with D.J.'s father, and she and D.J. lived with Patterson. In June 2005, a caller to the DCFS hotline reported scratches and bruises to D.J.'s body and that his toenails were discolored. A DCFS investigator visited D.J. while he was in Patterson's care and observed that D.J. had a healing scar on his forehead, discolored and infected toes, and slightly pink buttocks. Patterson claimed that D.J. merely injured himself in a fall outdoors and had diaper rash. Lori B. echoed Patterson's explanations and agreed to take D.J. to the doctor the next day. Lori B., however, failed to take D.J. to the doctor, and the investigator's attempts to contact Lori B. to verify that D.J. received treatment were unavailing.

DCFS received a second hotline call regarding D.J. on July 26, 2005. At the time, Patterson, Lori B. and D.J. were living in a motel. While Lori B. was at work, Patterson called the police to report that he had been robbed. When the police arrived, they saw D.J. lying still on the bed and that his head was swollen. D.J. was hospitalized, and Patterson was arrested and

2

charged with child endangerment, aggravated battery, and predatory criminal sexual assault. Patterson admitted to pinching D.J.'s thighs, burning his hand, and inserting a plunger into his rectum.

D.J.'s injuries included rectal trauma with evidence of healing, an enlarged rectal opening, and rectal tears. He had oral injuries, chin lacerations, comminuted skull occipital skull fracture with evidence of swelling, a greenstick fracture to the distal left radius, forehead bruising, an adult-sized bite mark to his abdomen, multiple nonpatterned bruises to the abdomen, bilateral healed hyper-pigmented lesions to the inner thighs, red linear bruises to the posterior right thigh, gonorrhea of the mouth, a healed lesion to the right palm, and chronic bilateral toenail irritation or trauma. He was diagnosed as a battered child and a victim of child sex abuse, repetitive child physical abuse, medical neglect, and failure to protect from harm.

Concerning D.J.'s injuries, Lori B. told medical personnel that D.J. had fallen down the stairs. She denied knowledge of the bite mark on his abdomen, scratches on his rectal and leg areas, and the laceration to his anus. She thought the discoloration to his inner thigh was due to diapers. She admitted seeing Patterson pinch D.J.'s thighs and claimed that she told Patterson "not to do that."

When Lori B. met with a DCFS investigator on July 27, 2005, she said that Patterson began babysitting for D.J. in the middle of May, that she knew he smoked marijuana, that her neighbors told her Patterson swore at D.J. and told him to shut up, and that she saw Patterson pinch D.J. between the legs in June. She admitted that she failed to comply with the doctor's instruction to bring D.J. for a follow-up visit after he received treatment for his toes in June. She

stated that she changed D.J.'s diapers three or four times on July 25, 2005, but only saw bruises on his thighs. She denied noticing the bite mark on his abdomen, burn on his hand, or injury to his arm. She admitted that she tried to protect Patterson by falsely telling the police that she did not know how D.J.'s thighs were injured and by falsely telling hospital staff that D.J. fell down the stairs in her presence.

After Lori B. took a polygraph test on July 27, 2005, she informed a Chicago police detective that Patterson started babysitting D.J. when they moved in together and he usually insisted on bathing D.J. and changing his diapers. She saw Patterson pinch the inside of D.J.'s thighs in an effort to get him to stop crying, and sometimes when she got home from work, she noticed bruises on D.J.'s legs, face, and arms. When she questioned Patterson, he said that D.J. fell down a lot. Sometime after July 4, 2005, she started noticing more bruises on D.J.'s thighs and abdomen and a bite mark on his abdomen. When she questioned Patterson, he said he was trying to get D.J. to stop crying and bit him to show him "who was in charge." Lori B. claimed that she told Patterson to stop biting D.J., and Patterson agreed. During the weekend of July 22, 2005, she noticed that when Patterson tried to take D.J. from her arms, D.J. shook his head no and cried. When she left for work at 9:30 p.m. on July 25, 2005, she did not notice anything wrong with D.J.

After D.J. was discharged from the hospital in August 2005, he was placed in a residential medical facility and assessed for services. Lori B. was also referred for services, including individual therapy. In March or April 2007, she surrendered her parental rights to D.J. and all services were discontinued. She was pregnant with M.W. at the time.

4

### B.  M.W.'s Case

Lori B. met M.W.'s father, respondent Darrion W., in June 2006, and he moved in with her in September 2006.  After several months, he started a relationship with another woman and moved out.  However, he resumed a relationship with Lori B. when she told him she was five months pregnant.  M.W. was born in September 2007, and four weeks later DCFS received an anonymous telephone call expressing concern for his safety due to the abuse D.J. sustained.  M.W. was taken into protective custody in October 2007 and placed with a foster parent.

The State's petition for adjudication of wardship alleged that M.W. had been neglected due to an injurious environment and abused due to the fact that his parent or some other person in the household created a substantial risk of physical injury to him by nonaccidental means.  At the October 2007 hearing, the parties stipulated that DCFS investigator Carmelia Watson would testify that Lori B. and Darrion W. resided together, but Darrion W.'s paternity of M.W. had not been established; that a previous parenting capacity assessment indicated Lori B. was unable to accept any responsibility for her part in the circumstances that led to DCFS's involvement with D.J.; that Lori B. failed to successfully complete recommended services including individual therapy; and that reasonable efforts could not prevent or eliminate the immediate and urgent necessity of removing M.W. from the home.

The trial court granted DCFS temporary custody of M.W. but continued the matter without prejudice as to Lori B.  The court also limited her visits to supervised or unsupervised day visits at the discretion of DCFS.  In November 2007, the court entered a finding that Darrion W. was M.W.'s father.  In February 2008, the court held a rehearing on the temporary custody

issue and awarded DCFS temporary custody of M.W.

## C. The Adjudication Hearing

In March 2008, at the adjudication hearing, the State submitted into evidence the adjudication order finding D.J. neglected and abused, the disposition order finding Lori B. unable and unfit to parent and protect him, and the order terminating her parental rights to him. Those orders detailed D.J.'s injuries and stated that Lori B. initially lied to the police and hospital personnel to protect her paramour.

The State also submitted the certified DCFS indicated report for M.W., which stated that when DCFS investigator Watson went to the home in response to the September 2007 hotline call, M.W. appeared healthy and well cared for, Lori B. appeared to be very nurturing, and there did not appear to be any risk to M.W. at that time. Furthermore, Watson reported that Lori B. said she quit going to therapy when she surrendered her parental rights to D.J. Moreover, she knew she was pregnant with M.W. at that time. She claimed that she stayed with Patterson, D.J.'s abuser, despite the signs of abuse because she did not have anywhere to go, but acknowledged that Patterson was unemployed and did not support her financially. Watson checked Darrion W.'s criminal background and found that he had six arrests between August 2005 and September 2007.

The State also submitted Lori B.'s June 2006 parenting capacity assessment in connection with D.J. According to that assessment, Lori B. claimed that she was living independently and was not in a relationship, but the caseworker doubted those claims because when she called Lori B. twice on her cell phone, a different man answered each time. Lori B. was in individual

therapy since October 2005, and therapy reports indicated that she had neither taken full responsibility for her failure to protect D.J. nor shown genuine remorse for that failure. Moreover, she was unable or unwilling to discuss much of her past with the therapist. Her dependent personality disorder diagnosis indicated that she would have difficulties becoming an independent, self-functioning person without a relationship with a man, and might repeat a pattern of selecting an abusive partner and prioritize that relationship above protecting her child. Accordingly, the psychologist who completed the assessment recommended that Lori B. continue in weekly individual therapy and complete parenting classes. The psychologist also recommended that Lori B.'s progress be monitored carefully and that DCFS conduct random visits to ensure that she lived alone.

The State also submitted into evidence Lori B.'s client discharge summary, dated March 30, 2007, which indicated that she was transferred in June 2006 to licensed clinical social worker Christine Schaefer and had attended weekly therapy inconsistently. Because Lori B. was functioning well, therapy was decreased to bimonthly. According to Schaefer's report, as of March 2007, Lori B. achieved her first goal of exploring her responsibility for D.J.'s abuse and understood her role in the abuse by allowing Patterson to care for D.J. despite the signs of abuse. She achieved the second goal–resolving her grief surrounding separation from D.J.–to the best of her ability. She was upset that the court determined D.J. would not be returned to her, but used therapy to process further, accepted the determination, and thought it was okay that D.J. would stay with his foster family. She made no progress on the third goal–attempting to resolve her past trauma–because she was not able to deal with her own past and it affected her current

functioning. Schaefer recommended that individual therapy stop for now and referred Lori B. to a community resource for further therapy if needed. According to her discharge summary, Lori B. was diagnosed with adjustment disorder with depressed mood, chronic, and dependent personality disorder with borderline features. She received a planned discharge from counseling services because she was "not able to benefit from further service," and the service evaluation was categorized as "successful."

The State also submitted Lori B.'s psychological evaluation, done in October 2005 by Dr. Paul Linden, a clinical psychologist. Dr. Linden reported that Lori B.'s full-scale IQ tested at 82, in the low average range of intellectual functioning. She met the DSM-IV criteria for dependent personality disorder with borderline features. She used denial to such an extent that she had very poor judgment. Because she viewed herself as unattractive and defective, her fear of rejection and criticism led her to seek out individuals with obvious character flaws. Her self-esteem deficits caused her to be dependent on others and cling to dysfunctional relationships. She needed to be referred to a highly qualified mental health professional with experience in working with individuals with severe character disorders. Her severe characterological issues prevented her from demonstrating reasonable judgment and interfered with her capacity to protect herself or her child from others. Dr. Linden opined that Lori B. would be unable to care for D.J. until she successfully addressed her issues in therapy. Furthermore, Dr. Linden noted that extensive therapy for two to three years would likely be required.

The parties stipulated that DCFS investigator Watson would testify that D.J. was found abused and neglected, including physical and sexual abuse; that a June 2006 parenting capacity

assessment indicated Lori B. was unable to accept full responsibility for her part in D.J.'s abuse; that she failed to successfully complete her recommended services, including individual therapy; and that she and Darrion W. resided together.

Lori B. submitted into evidence the affidavit of Dr. Linden dated February 4, 2008, which stated that his October 2005 evaluation of her was outdated. Due to the amount of time that had passed since the 2005 evaluation, Dr. Linden had no current opinion concerning the risk Lori B.'s personality characteristics posed for M.W.

The court found M.W. neglected due to an injurious environment, but found that the State did not meet its burden concerning the allegation of abuse due to a substantial risk of physical injury. The court noted that when M.W. was taken into protective custody, Lori B. had not successfully completed individual therapy and other recommended services. Furthermore, the court noted that although Dr. Linden could not testify that Lori B. currently had the same psychiatric issues that were identified in 2005, Dr. Linden's concerns from 2005 were valid, needed to be addressed, and the recommended therapeutic services needed to be completed.

### D. Disposition Hearing

The case then proceeded to a disposition hearing in April 2008 to determine whether it was in the best interests of M.W. to be made a ward of the court.

The State submitted into evidence the 46-page, January 2008 integrated assessment report, which was prepared by licensed clinical social worker Kevin McMahon based on interviews he and DCFS caseworker Javonna Smith conducted with the parties. McMahon and Smith also reviewed numerous records. The report contained detailed information concerning

1-08-0981

(1) the DCFS case involving D.J.; (2) the parents' interviews, personal histories, education and cognitive functioning, criminal background, work histories, relationships, current living situations, substance use, hobbies, support systems, parenting abilities, medical conditions, and mental and emotional health; (3) M.W.'s health condition, development, history, and interaction with caretakers; (4) the family's functioning factors; and (5) recommendations.

According to the report, Lori B. showed limited awareness of the dynamics of her relationship with D.J.'s abuser and, thus, was unlikely to recognize a similar dynamic in any future relationship. She lacked an empathic understanding of her own experiences and those of her child. Due to the deeply rooted nature of her vulnerability and anxiety concerning her own childhood, she might not make sufficient timely progress in therapy to meet M.W.'s developmental needs. M.W. was in foster care, attended daycare, and had visitation with Lori B. every day. The foster mother indicated that M.W. could be difficult to soothe at times. She described him as a somewhat fussy, unpredictable and demanding baby. The report concluded that the prognosis for the family's reunification, as of January 2008, was poor. Lori B. had not yet mastered her internal issues. Although she might benefit from engaging in recommended services, the entrenched nature of her difficulties and her limited insight over the past two years made it highly unlikely that she could make sufficient progress in time to meet M.W.'s developmental needs.

The State also submitted a February 2008 general counseling quarterly report, which showed that Lori B. had attended sessions inconsistently. Lori B. had made some connections between her own childhood experiences and her own parenting, and her therapist recommended

10

that she continue to attend weekly counseling on time and consistently.

The State also submitted letters written by DCFS caseworker Smith in February and March of 2008 to Lori B. and Darrion W. The letters indicated that respondents failed to provide dates to meet to discuss reunification with M.W. and that Darrion W. could no longer have unsupervised visits with M.W. due to Darrion W.'s outstanding criminal issues.

At the hearing, Smith testified that she had been assigned to M.W.'s case since September 2007. In accordance with her assessed services, Lori B. attended weekly domestic violence services and individual counseling twice a week, complied with monthly random urine testing, and visited M.W. When the domestic violence services assessment was completed, the service provider would make a recommendation regarding whether Lori B. needed further services through their program. Because Lori B. needed more than just basic counseling, she was recently referred to John Stokes for psychotherapy twice a week. Smith testified that Lori B. was affectionate with M.W. and acted appropriately during their visits. Moreover, M.W. seemed to feel secure with her, and they had an emotional attachment. From October 2007 to mid-March 2008, Lori B. had seen M.W. every day, unsupervised, for five hours per day, longer on weekends and holidays, and there had been no unusual incidents. However, after DCFS investigated Darrion W.'s criminal record and found recent arrests for nonviolent crimes, Lori B.'s visits with M.W. since mid-March were restricted to supervised visits. That restriction was based on concerns about her judgment because she had failed to protect D.J. from her past paramour and failed to disclose negative information concerning Darrion W.'s recent arrests.

11

Smith testified that Darrion W. failed to comply with his assessed services, including attending individual therapy and domestic violence counseling, and engaging in intensive outpatient drug treatment. He had not contacted the foster parent concerning visitation and failed to maintain contact with Smith. Lori B. claimed that she and Darrion W. had separated and were no longer living together. Smith, however, had not been able to verify that information, and Lori B. could not provide a forwarding address for Darrion W.

Smith testified that M.W.'s current foster home was safe and appropriate and DCFS recommended that he be adjudged a ward of the court and not returned to Lori B. yet because she needed to be involved in services longer. DCFS would be better able to make a decision once the recently involved therapists and professionals could assess Lori B.'s situation and make a recommendation. DCFS was concerned about M.W.'s safety because Lori B.'s relationships impaired her judgment. Smith stated that reunification of M.W. with Lori B. or Darrion W. was a reasonable goal, and a return home under an order of protection might be possible if sufficient progress was made over the next few months. Lori B. had steady employment as a certified nursing assistant, possessed basic child-rearing skills, and had the appropriate space and equipment to care for M.W. in her home. The only issue hindering M.W.'s return home was DCFS's concern about Lori B.'s judgment with respect to significant others. Because a return-home recommendation was based on the trust relationship between the caseworker and the family, it was a major concern that Lori B. could not provide DCFS with Darrion W.'s address, and DCFS could not contact him to get his address.

The trial judge informed the parties that he was considering splitting custody and

guardianship of M.W., giving custody to Lori B. and guardianship to DCFS, while reserving ruling on whether Lori B. was fit, willing and able to care for and protect M.W. DCFS, however, objected, stating that, as M.W.'s guardian, it would not choose to place him with Lori B. at that time. The trial judge asked whether Lori B.'s individual psychotherapy would continue in place if she was found fit and M.W. was returned to her. The trial judge also was concerned that a child as young as M.W. should benefit from being with his caregiver as much as possible, which was difficult to accomplish given the realities of agencies with limited staff attempting to provide supervised visits for a minimum of an hour a week. The Public Guardian and DCFS informed the judge that Lori B. was having visitation with M.W. every day and DCFS would continue to provide and pay for the services listed in Lori B.'s service plan even if M.W. was returned home under an order of protection.

The trial court found that it was in M.W.'s best interest to be adjudged a ward of the court. The court also found Lori B. fit, able and willing to care for M.W., but found Darrion W. unable to care for him. The court vacated temporary custody and returned M.W. to the care and custody of Lori B. under an order of protective supervision, which required, *inter alia*, that Lori B. attend domestic violence counseling and individual psychotherapy sessions and follow all recommendations. Darrion W.'s visitation with M.W. would be supervised by DCFS until he engaged in services, and Lori B. was not permitted to supervise visits between Darrion W. and M.W.. The Public Guardian asked for a stay of the judgment pending appeal, but the court denied that request.

The Public Guardian immediately filed a notice of appeal and emergency motion for a

stay, which this court granted on the same day, pending a response by Lori B. to the motion and further order of this court. Thereafter, this court allowed the stay pending resolution of this appeal. This court ordered that M.W. remain in the custody of DCFS with supervised visits only.

## II. ANALYSIS

Following the filing of a petition for wardship by the State and the placement of a child in temporary custody, the circuit court conducts an adjudicatory hearing to determine whether the allegations of the petition that a minor is abused, neglected or dependent are supported by a preponderance of the evidence. 705 ILCS 405/1-3(1), 2-21 (West 2006). "Preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not." In re K.G., 288 Ill. App. 3d 728, 735 (1997).

The best interest of the child is the paramount consideration whenever a petition for adjudication of wardship or any proceeding is brought under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 et seq. (West 2006)). In re K.G., 288 Ill. App. 3d at 735. At the adjudicatory stage, the court must focus solely on whether the child has been neglected or abused, not upon whether the parents were neglectful or abusive. 705 ILCS 405/1-3(1) (West 2006); see In re Arthur H., 212 Ill. 2d 441, 465 (2004).

If the State satisfies its burden of proof, the circuit court proceeds to a disposition hearing to determine whether it is consistent with the health, safety and best interests of the minor and the public to make the minor a ward of the court, and to determine what order of disposition should be made in respect to the minor so adjudged. 705 ILCS 405/1-3(6), 2-22 (West 2006).

A trial court's finding of abuse or neglect is entitled to great deference on appeal and will

14

1-08-0981

be disturbed only if it is found to be against the manifest weight of the evidence. In re A.D.W., 278 Ill. App. 3d 476, 482 (1996). A trial court's finding is against the manifest weight of the evidence if a review of the record clearly demonstrates that the opposite result would be the proper one. In re T.B., 215 Ill. App. 3d 1059, 1062 (1991). The great deference afforded to the trial court is warranted due to its superior position to observe the witnesses, assess credibility and weigh the evidence. In re T.B., 215 Ill. App. 3d at 1062.

A. Substantial Risk of Injury

On appeal, the Public Guardian and State contend that the State proved by a preponderance of the evidence that M.W. was abused due to a substantial risk of physical injury, and the trial court's ruling to the contrary was against the manifest weight of the evidence. Specifically, they note that Lori B. did not complete individual therapy, which stopped in March 2007 when she surrendered her parental rights to D.J. She was about four months pregnant with M.W. at the time. On her discharge summary, her therapist still diagnosed her with adjustment disorder with depressed mood, chronic, and dependent personality disorder with borderline features. Because Lori B.'s therapy stopped, she did not resolve the psychiatric issues that prevented her from protecting D.J. from physical and sexual abuse and, thus, did not become a strong or capable parent for M.W. The Public Guardian and State assert the evidence established that M.W. was exposed to a substantial risk of physical injury.

A neglected minor includes any minor under 18 years of age whose environment is injurious to his or her welfare. 705 ILCS 405/2-3(1)(b) (West 2006). Neglect is defined as the failure to exercise the care that circumstances justly demand and encompasses both willful and

15

unintentional disregard of parental duty. In re Arthur H., 212 Ill. 2d at 463. The term is not one of fixed and measured meaning, and it takes its content from the specific circumstances of each case. In re Arthur H., 212 Ill. 2d at 463. An injurious environment is an amorphous concept that cannot be defined with particularity but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children. In re Arthur H., 212 Ill. 2d at 463.

An abused minor includes any minor under 18 years of age whose parent creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function. 705 ILCS 405/2-3(2)(ii) (West 2006). Specific intent to hurt the child does not need to be established to prove abuse. In re F.S., 347 Ill. App. 3d 55, 63 (2004). Cases involving abuse, neglect and wardship are *sui generis*; each case must be decided on its own distinct set of facts and circumstances. In re J.P., 294 Ill. App. 3d 991, 1002 (1998).

The allegations against Lori B. were based on a theory of anticipatory neglect, whereby the State seeks to protect not only children who are the direct victims of neglect or abuse, but also those who have a probability to be subject to neglect or abuse because they reside with an individual who has been found to have neglected or abused another child. In re Arthur H., 212 Ill. 2d at 468. The theory of anticipatory neglect flows from the injurious environment concept set forth in the Juvenile Court Act. In re Arthur H., 212 Ill. 2d at 468. There is no *per se* rule that the neglect of one child conclusively establishes the neglect of another child in the same household. In re Arthur H., 212 Ill. 2d at 468. Rather, such neglect should be measured by the

16

circumstances surrounding the sibling, and the care and condition of the child in question. In re Arthur H., 212 Ill. 2d at 468. Although proof of neglect of one minor is admissible evidence on the issue of the neglect of any other minor for whom the parent is responsible, it does not constitute conclusive proof of the neglect of another minor. In re Arthur H., 212 Ill. 2d at 468. Each case must be reviewed according to its own facts. In re Arthur H., 212 Ill. 2d at 468-69.

Here, the State did not establish by a preponderance of the evidence that M.W. was exposed to a substantial risk of physical injury. M.W. lived for the first month of his life at home with respondents without incident. He appeared healthy and well cared for, and Lori B. had all the items necessary for his care. Furthermore, both Lori B.'s unsupervised and supervised visits with M.W. were appropriate and without incident. Although she did not successfully complete individual therapy, she did engage in the recommended services until the court determined that the goal for D.J. was no longer to be returned home to her. When she surrendered her rights to him, therapy was discontinued because she was not able to benefit from further services. Moreover, respondent Darrion W. had no history of any type of violent behavior. Patterson, the perpetrator of D.J.'s injuries, was incarcerated and no longer involved with Lori B. The trial court was well aware of the facts concerning the severe abuse Patterson inflicted on D.J. and was well within its discretion to decide that Lori B.'s history and psychological issues put M.W. in an environment that was injurious to his health and welfare, but did not rise to the level of a substantial risk of physical injury. The trial court's finding was not against the manifest weight of the evidence.

## B. Fitness Finding

1-08-0981

Next, the Public Guardian and State contend the trial court's ruling that Lori B. was able to care for and protect M.W. was contrary to the manifest weight of the evidence where M.W. was found neglected due to an injurious environment and Lori B. needed to make progress in therapy. We agree.

If a child has been found neglected or abused, the court proceeds to a disposition hearing to determine whether it is consistent with the health, safety and best interests of the child and the public that he be made a ward of the court. 705 ILCS 405/2-21(2), 2-22 (West 2006). If the child is made a ward of the court, the court may order him to continue in his parents' custody; place him–*inter alia*–with a suitable relative or in the care of DCFS; restore custody to his parents; or order him partially or completely emancipated. 705 ILCS 405/2-23(1)(a) (West 2006). However, custody of the child shall not be restored to any parent whose acts or omissions formed the basis of the court's finding of neglect or abuse until (1) a hearing is held on the issue of the child's best interests and the fitness of the parent to care for the child without endangering his health or safety, and (2) the court enters an order that the parent is fit to care for the child. 705 ILCS 405/2-23(1)(a) (West 2006).

Here, the evidence established that Lori B. was unable, for some reason other than financial circumstances alone, to safely care for and protect M.W. and that reunification was not in his best interest. DCFS recommended that Lori B. needed to complete therapy before M.W. would be safe in her care. The caseworker testified that although the return home goal was reasonable and it was conceivable that M.W. could be returned to Lori B. if she made sufficient progress in her services, she had not made sufficient progress as of the date of the disposition

18

hearing. During the first quarter of 2008, she attended therapy inconsistently, and she and Darrion W. had failed to contact the caseworker about meeting to discuss reunification with M.W. Furthermore, Lori B. was still being assessed for domestic violence services at the time of the disposition hearing. Moreover, Lori B. was referred just that week to a more experienced therapist for psychotherapy because the nature, duration and extent of her issues went beyond her first therapist's reach.

The evidence showed that Lori B. and M.W. had an emotional bond, Lori B. cared for him and interacted with him appropriately, and she had the capacity to feed, clothe and shelter him. However, Lori B. had failed to protect her older son from severe physical and sexual abuse by her previous paramour, and her unresolved psychological issues from her own past trauma raised concerns about her judgment in relationships and capacity to protect M.W. Specifically, the evidence established that Lori B. saw the signs of D.J.'s abuse over a period of time but failed to report it or remove him from her paramour's care. Then, she lied to the police and medical personnel in an attempt to protect her paramour.

The doctor's and therapists' evaluations consistently stated that Lori B. needed to fully deal with her own history of trauma so that she could become an independent, self-functioning person, capable of protecting herself and her child from others rather than seeking and clinging to dysfunctional relationships. Her psychological assessments established that she had a dependent personality disorder with borderline features. Contrary to respondents' assertion, that personality disorder diagnosis was current for M.W.'s case where therapist Schaefer's analysis was done in March 2007, just five months before M.W. was born. Furthermore, Dr. Linden did not disavow

his October 2005 evaluation of Lori B. Rather, he simply did not opine about the risks her personality characteristics posed for M.W. due to the two-year passage of time. He did not disavow or express any doubt about the validity of the dependent personality diagnosis at the time he made it. In addition, the January 2008 integrated assessment report concluded that reunification of the family at that time was poor based on the entrenched nature of Lori B.'s difficulties, her failure to master her internal issues, and her limited insight concerning the events over the past two years.

The trial judge stated that the abuse suffered by D.J. was the worst the judge had seen for such a young child. Moreover, the judge acknowledged that Lori B. still needed to make progress in individual psychotherapy and domestic abuse counseling. Although the judge was concerned that supervised visits might not afford M.W. ample contact with Lori B. to nurture their bond, the evidence established that Lori B. had daily visitation with him. Furthermore, Lori B. was responsible for the lack-of-trust issue that led DCFS to change her visits from unsupervised to supervised. Specifically, she was not forthcoming about her knowledge of the recent arrests of Darrion W., who failed to participate in individual therapy, domestic abuse counseling, and drug treatment. In addition, DCFS doubted Lori B.'s veracity concerning Darrion W.'s residence.

The trial court's decision finding Lori B. fit and returning M.W. to her under an order of protection was against the manifest weight of the evidence where M.W. was neglected due to an injurious environment and Lori B. had not made sufficient progress in therapy and counseling to deal with the psychiatric disorder that had prevented her from protecting D.J. We therefore

reverse the trial court's disposition hearing order, enter a finding that Lori B. was unable to parent M.W., and vacate the order of protection under which he was returned home. In addition, we enter a disposition order placing M.W. in the guardianship and custody of the DCFS Guardianship Administrator.

### III. CONCLUSION

We affirm the trial court's order finding M.W. neglected due to an injurious environment, but reverse its order finding Lori B. fit, willing and able to care for and protect him. We enter a finding that Lori B. was unable to parent M.W., and place him in the guardianship and custody of the DCFS Guardianship Administrator.

Affirmed in part and reversed in part.

TULLY and GALLAGHER, JJ., concur.

1-08-0981

*In re* M.W., a Minor,

Respondent-Appellant

(The People of the State of Illinois,

Petitioner-Appellant,

v.

Lori B. and Darrion W.,

Respondents-Appellees).

No.  1-08-0981

Appellate Court of Illinois
First District, FIFTH DIVISION

October 31, 2008

Justice Margaret O'Mara Frossard authored the opinion of the court:

Justice Tully and Justice Gallagher concur.

Appeal from the Circuit Court of Cook County.
The Hon. Maxwell Griffin, Jr., Judge Presiding.

**COUNSEL FOR MINOR-RESPONDENT-APPELLANT**
Robert F. Harris, Cook County Public Guardian, Chicago, IL 60612
OF COUNSEL: Kass A. Plain, Susan S. Wigoda and Jean M. Agathen

**COUNSEL FOR RESPONDENTS-APPELLEES**
Legal Assistance Foundation of Metropolitan Chicago, Chicago, IL 60604
OF COUNSEL: Steven L. Pick, Sara B. Block, Richard Cozzola and Jack Block

(USE REVERSE SIDE IF NEEDED)

1-08-0981