2020 IL App (1st) 200355-U

FIRST DIVISION
August 10, 2020

No. 1-20-0355

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| *In re* J.S., a Minor, | ) | |
| | ) | Appeal from the |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
| | ) | Cook County |
| Petitioner-Appellee, | ) | |
| | ) | No. 19 JA 515 |
| v. | ) | |
| | ) | The Honorable |
| C.S., | ) | Demetrios G. Kottaras, |
| | ) | Judge Presiding. |
| Respondent-Appellant). | ) | |

JUSTICE PIERCE delivered the judgment of the court.
Presiding Justice Griffin and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The judgment of the circuit court is affirmed. The circuit court did not err by finding that respondent abused and neglected her minor son, and the circuit court's order terminating respondent's parental rights was not against the manifest weight of the evidence.

¶ 2    Respondent, C.S., appeals from orders of the juvenile court finding that she abused and neglected J.S., her minor son, and declaring J.S. a ward of the court. Respondent challenges the circuit court's adjudication and dispositional orders. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Respondent is the mother of J.S., a minor born in May 2019. On May 20, 2019, the State filed a petition for adjudication of wardship for J.S. alleging that J.S. was abused or neglected. The petition contained the following allegations. Respondent had "one prior indicated report for substantial risk of injury/environment injurious to health and welfare by neglect." One of respondent's other minor children, A.S., was in DCFS custody with findings of neglect and abuse having been entered and reunification services remained outstanding. Respondent had been diagnosed with "adjustment disorder with depressed mood, passive and dependent personality features and borderline intellectual functioning." On May 20 and May 22, 2019, the circuit court found that it was necessary to remove J.S. from respondent's home, entered temporary orders of custody of J.S. in favor of DCFS, and appointed a guardian *ad litem* for J.S.

¶ 5     The matter proceeded to an adjudicatory hearing. The parties stipulated to all of the following testimony and documentary evidence, much of which relates to events prior to J.S.'s birth. According to a 2015 psychological evaluation, respondent was born prematurely in 1993. Her father used drugs and alcohol and he would verbally and physically abuse respondent's mother while intoxicated. Respondent's mother died in 2009. After respondent's mother's death, respondent's father was verbally and physically abusive toward respondent. Respondent then went to live with a maternal aunt. Respondent graduated from high school in 2012 and had been involved special education services since the fifth grade due to a learning disability. Respondent moved out of her aunt's home but struggled to maintain stable housing. She moved in with her boyfriend, J.T., while pregnant with J.S.'s older brother, A.S., but respondent moved out when A.S. was born. She did not know the identity of A.S.'s father. Respondent and A.S. moved in with one of respondent's father's friends, Allen C., and Allen C.'s "paramour [Cheryl S.] at the

recommendation of [respondent's] father when she had nowhere else to live." Respondent and Allen C. had a sexual relationship. A.S. was removed from respondent's custody in November 2014 after respondent left A.S. in the custody of Allen C. and Cheryl S., despite being aware that the two had a history of domestic violence, mental illness, and substance abuse. In May 2015, an adjudication of neglect/injurious environment was entered against respondent, who was subsequently found to be unable to parent A.S. in August 2015. Respondent was found to have an IQ of 71 and a limited ability to apply critical thinking or abstract though to solve problems. A March 2017 parenting capacity evaluation found that respondent believed that a normal body temperature was between 50°F and 60°F, and that a body temperature of 98°F would require a child to be taken to an emergency room. The psychologist concluded that respondent "has significant cognitive deficits that impact her ability to independently parent," and that her impairments "negatively impact her ability to gain insight and use good judgment." Despite having completed domestic violence classes, respondent lacked insight into the concepts taught during those classes. And despite having completed several reunification services regarding A.S., A.S. remained at risk if returned to respondent's care due to her cognitive deficits, poor knowledge of child development, history of domestic violence, continued housing instability, and lack of a support system.

¶ 6    The stipulated evidence showed that J.S. was born in May 2019. Hospital records reflect that Allen C. was listed as respondent's next of kin and respondent's father was identified as her "support person." Hospital staff were told that respondent's father would be caring for respondent and J.S. upon discharge. Respondent had not received sufficient prenatal care, and hospital staff found her to be an unreliable historian of her living circumstances. A consultation with child protective services was ordered.

¶ 7      The parties stipulated that DCFS investigator Yvette Booze would testify that she had an in-person conversation with respondent in May 2019. Respondent had a prior indicated report for substantial risk of physical injury, environment injurious to health and welfare by neglect for A.S., who was in DCFS custody with a permanency goal of substitute care pending termination of respondent's parental rights. Booze would also testify that respondent disclosed that she had a psychological evaluation in October 2015 and had a diagnosis of adjustment disorder with depressed mood but was not taking any medications.

¶ 8      The parties stipulated that Sara Jacobs, a caseworker for Lydia Home Association assigned to respondent's cases, would testify that respondent's other minor child, A.S., was in DCFS care at the time of J.S.'s birth, and that respondent was still in need of individual therapy and domestic violence services at the time of J.S.'s birth.

¶ 9      The parties further stipulated that Malva Waters, a supervisor at Lydia Home Association assigned to respondent's cases since 2017, would testify that respondent had five hours of unsupervised day visits with A.S. until May 2017 when A.S.'s goals were changed from reunification to the termination of respondent's parental rights. Numerous documents were admitted into evidence by stipulation.

¶ 10      On January 22, 2020, after considering the stipulated evidence and hearing argument from counsel, the circuit court entered a finding of neglect/injurious environment against respondent. The circuit court's written order reflects that J.S. was abused or neglected under section 2-3 of the Juvenile Court Act (Act) (705 ILCS 405/2-3 (West 2018)) due to an injurious environment (*id.* § 2-3(1)(b)) because respondent was still in need of individual therapy and domestic violence services at the time of J.S.'s birth, and because of DCFS's "concerns regarding [respondent's]

judgment," which were echoed by the Cook County Juvenile Court Clinic and in respondent's psychological exams.

¶ 11　The matter proceeded to a dispositional hearing the same day. The parties stipulated to a June 2019 integrated assessment (IA), which was entered into evidence. The IA reflects the following. Respondent was living with a female roommate in Berwyn and had been living there for a year. Respondent had recently obtained a job at a restaurant. Respondent's cognitive abilities affected her decision making and judgment and there was a moderate risk of errors in her decision making. Respondent did not receive sufficient prenatal care during her pregnancy with J.S. J.S.'s putative father, Jesse S., ended his relationship with respondent during the pregnancy because he did not want to be involved with DCFS or to complete a background check. Respondent appeared to be unable to effectively engage with providers to improve her parenting skills and needed time to focus on her own individual therapy and recovery from domestic abuse. The IA cited a previous parenting capacity assessment reflecting that, while respondent had completed services in 2017, her cognitive limitations prevented her from fully internalizing the information and guidance she had been provided. The IA recommended that respondent obtain trauma-based therapy and a psychiatric evaluation. The prognosis for J.S.'s return home with respondent was poor.

¶ 12　The State called Malva Waters, the caseworker assigned to respondent's case, as a witness and she gave the following testimony. Respondent was in need of individual therapy, a psychiatric evaluation, parenting classes, and domestic violence classes. Respondent had not yet been referred for individual therapy because respondent had obtained her own therapist, whom Waters had not been able to reach to determine any treatment goals or whether the therapist was appropriate in regard to DCFS's requirements. Waters, therefore, had not been able to provide the therapist with supporting documentation for respondent. Respondent had not yet been referred for a psychiatric

evaluation, to parenting classes, or for domestic violence services, but those referrals were expected to happen within 30 days of the hearing. The domestic violence services were recommended because respondent was arrested in August 2018 for "another domestic violence issue." There were concerns about the people with whom respondent associated, particularly Allen C., due to his history of domestic violence issues. Respondent had weekly supervised visits with J.S. that lasted two hours each and there were no concerns about those visits. J.S. was doing "very well" in his placement home, there were no concerns about his current placement, and he was not in need of any services. The agency had not had any contact with J.S.'s putative father, Jessie R., despite a diligent search. It was the agency's belief that it was in J.S.'s best interests to be made a ward of the court in order to give respondent time to engage with and make substantial progress in the recommended services. Respondent was living with a roommate and there were no concerns about J.S. visiting respondent's home. There were agency plans to increase respondent's visitation with J.S. It was a "big step" for respondent to maintain stable housing and consistent, stable employment.

¶ 13    After hearing argument from counsel and considering facts in the documentary record, the circuit court found that respondent was unable to parent J.S., ordered that J.S. be made a ward of the court, and appointed a guardian. There was no involvement from J.S.'s father or any appearance filed on his behalf, and therefore Jessie R. was unable, unwilling, and unfit to be J.S.'s parent. Respondent filed a timely notice of appeal from the circuit court's January 22, 2020, adjudication and disposition orders.

¶ 14                                  II. ANALYSIS

¶ 15    On appeal, respondent argues that the circuit court's adjudication and disposition orders are against the manifest weight of the evidence. The State and J.S. address the merits of

respondent's arguments and argue that the circuit court's adjudication order is subject to *de novo* review because the parties stipulated to all of the evidence presented at the adjudication hearing. Respondent has not filed a reply brief and thus has not responded to the argument regarding our standard of review of the circuit court's adjudication order.

¶ 16    "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). The State bears the burden of proving allegations of neglect by a preponderance of the evidence, meaning that the allegations of neglect are more probably true than not. *In re A.P.*, 2012 IL 113875, ¶ 17. Ordinarily, we review a circuit court's adjudication order under the manifest weight of the evidence standard. *Id.* However, here we agree with the State and J.S. that our review of the circuit court's adjudication order is *de novo* because the adjudicatory finding was based on a stipulated record, the circuit court did not make any discretionary decisions regarding the admissibility of any of the evidence, and the circuit court did not assess the credibility of any of the witnesses' testimony. See *In re Zion M.*, 2015 IL App (1st) 151119, ¶ 28 (finding that *de novo* review is the proper standard of review of a judgment based on a stipulated record because "the trial court was not in a better position than the reviewing court to assess credibility or weigh the evidence.").

¶ 17    Section 2-3(1)(b) of the Act provides that neglected persons include "any minor under 18 years of age *** whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2018). In *In re A.P.*, our supreme court stated

> "Generally, neglect is defined as the failure to exercise the care that circumstances justly demand. [Citations.] This does not mean, however, that the term neglect is limited to a narrow definition. [Citation.] As this court has long held, neglect

encompasses [willful] as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes. [Citations.] Similarly, the term injurious environment has been recognized by our courts as an amorphous concept that cannot be defined with particularity. [Citation.] Generally, however, the term injurious environment has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children. [Citations.]" (Internal quotation marks omitted.) *In re A.P.*, 2012 IL 113875, ¶ 22.

¶ 18     We find that the circuit court did not err in finding that the State proved by a preponderance of the evidence that J.S. was abused or neglected by exposure to an injurious environment under a theory of anticipatory neglect. "The theory of anticipatory neglect flows from the concept of an 'injurious environment' which is set forth in the Act." *In re Arthur H.*, 212 Ill. 2d at 468. The theory of anticipatory neglect protects children who have a probability of being neglected or abused due to living with someone who has already been found to have neglected or abused another child. *In re Chelsea H.*, 2016 IL App (1st) 150560, ¶ 84; *In re Kamesha J.*, 364 Ill. App. 3d 785, 793 (2006). A previous finding of neglect or abuse against one child is not conclusive of neglect or abuse against another child, but such a finding is admissible and relevant (*In re Chelsea H.*, 2016 IL App (1st) 150560, ¶ 84; *In re Kamesha J.*, 364 Ill. App. 3d at 793), and should be considered along with the care and condition of the child in question (*In re Arthur H.*, 212 Ill. 2d at 468).

¶ 19     Here, the record reflects that respondent failed to make reasonable progress toward reunification with J.S.'s sibling, A.S., in the years that respondent was receiving services, and she

failed to achieve reunification with A.S. There were concerns—both during her reunification efforts with A.S. and prior to the adjudicatory hearing at issue here—that respondent had not internalized the information she was provided in her parenting classes. When the circuit court previously terminated respondent's parental rights for A.S., the circuit court expressly found that respondent had not been able to effectively apply the skills she learned from her services and that she exercised poor decision making. The stipulated evidence in the record shows that she might struggle to recognize situations in which her decisions might put a child at risk. Here, at the time of J.S.'s birth, respondent listed Allen C. as her next of kin, despite the fact that A.S. was removed from respondent's care after respondent left A.S. with Allen C., who had a history of domestic violence and substance abuse. Respondent also listed her father as the person who would be caring for respondent and J.S. upon discharge from the hospital, despite her father's history of domestic violence and substance abuse. In other words, at the time of J.S.'s birth, respondent demonstrated that she was relying on the same support system that had caused her to lose custody of A.S. Respondent's cognitive deficiencies, poor decision-making skills, and a current lack of a personal support system were documented in the record. These facts, combined with respondent's current need for individual therapy and domestic violence services, support a finding that J.S. was born into an injurious environment under a theory of anticipatory neglect. Simply put, respondent was in virtually the same position she was in when her parental rights for A.S. were terminated and evidence in the record established that respondent had not adequately internalized the lessons of the services she received in connection with A.S.

¶ 20    Respondent relies on the following evidence in the record to support her argument that the circuit court's adjudication order is erroneous. She was able to have five-hour unsupervised visits with A.S. until 2017 when A.S.'s goals were changed, and that during those visits she was

attentive, showed affection, and tended to A.S.'s needs. A Cook County Juvenile Court Clinic report from March 2017 reflected that respondent's mental health was stable, she had organized thought processes, and she could maintain attention throughout a long interview. While she was found to have below average intelligence, respondent was able to provide detailed personal and family history, had graduated from high school, and had secured a variety of jobs. A 2015 psychiatric evaluation found that she did not meet the criteria for mental illness, and respondent argues that there was no evidence that she had any psychiatric disorder that would prevent her from parenting J.S. There were favorable reports from 32 parenting coaching sessions she completed in 2016 reflecting that respondent took appropriate corrective actions with J.S.'s sibling, A.S., and that she kept her composure while helping him learn from mistakes. She displayed affection and verbal praise, maintained focus and patience, and was able to "handle the complete spectrum of behavior and emotion" displayed by A.S. She also relies on evidence showing that her adaptive functioning was stronger than her cognitive functioning, and her conceptual and practical skills were average. She contends that the State failed to establish anticipatory neglect because there was no showing that she had not learned from her previous mistake of leaving her child with an inappropriate caretaker, and there was no showing that the same or similar conduct might occur.

¶ 21    We find that, on balance, the State proved by a preponderance of the evidence that J.S. was subjected to an injurious environment at the time of his birth under a theory of anticipatory neglect because the allegations of neglect are more probably true than not. Respondent previously failed to make reasonable progress toward reunification with A.S. and continued to represent that her support system consisted of the people who directly contributed to A.S. being removed from respondent's care. While respondent's living and employment situations had improved, she was still in need of the same services she was required to receive when A.S. was removed from her

care. In our view, the progress that she may have made in the years between the termination of her parental rights of A.S. and the birth of J.S. do not overcome the continued risks that J.S. might, if left in respondent's care, be neglected or abused in the same manner that A.S. was. Therefore, we affirm the circuit court's judgment finding that respondent abused or neglected J.S. through an injurious environment.

¶ 22    Next, respondent argues that the circuit court's termination of her parental rights was against the manifest weight of the evidence. We review a circuit court's judgment following a dispositional hearing under the manifest weight of the evidence standard. *In re Brandon L.*, 2015 IL App (1st) 150779, ¶ 89. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *In re A.P.*, 2012 IL 113875, ¶ 17.

¶ 23    Respondent argues that while further services might have been beneficial, the State did not establish that any services were necessary in order for her to be an able parent. She relies on Waters's testimony that respondent had obtained her own therapist to argue that the State failed to prove "that [respondent] was not was successfully engaging in individual therapy, whether she had progressed with respect to the goals, and whether it was even still needed for [respondent] to be able to parent." She further contends that Waters had not timely referred respondent for a psychiatric evaluation and offered no explanation as to why respondent had not been referred earlier, which "ensured that there would be a non-completed service task at the time of the dispositional hearing ***." Furthermore, respondent had not been able to participate in parenting classes because the next available class with the chosen provider would not begin until February 2020—after the dispositional hearing—and respondent had indicated a willingness to take the classes with a different provider. She also argues that visitations with J.S. were going well, there were plans to increase the visits in her home, and she was steadily employed. J.S.'s response to

11

respondent's arguments in part acknowledges that it appears that referrals were not made as quickly as they could have been, but he relies on *In re Marianna F.-M.*, 2015 IL App (1st) 142897 to argue that "the fact that [respondent] was not engaged in necessary services meant that she was unable to parent," as services had been recommended but not started.

¶ 24    In *In re Marianna F.-M.*, 2015 IL App (1st) 142897, ¶¶ 36-37, we reversed a circuit court's dispositional finding that a father was fit and able to parent his minor child. The circuit court had found that the minor's father had abused and neglected the minor due to a lack of care, substantial risk of injury or physical injury, and excessive corporal punishment (*id.* ¶ 9), but concluded that it was in the minor's best interest to be returned to her father's care because the father "underst[ood] the inappropriateness of what happened in the home and that he will be able to provide at this point a safe and stable home with the assistance and help of the services that have been ordered" (*id.* ¶ 29). We found in part that the circuit court's judgment was against the manifest weight of the evidence because the father had not actually completed the services that were recommended in the integrated assessment considered at the dispositional hearing. *Id.* ¶ 36. It was of no moment that his failure to complete those services were through no fault of his own because that "[did] not negate that these services were recommended in order to ensure that [the father] could safely reunify with [the minor]." *Id.*; see also *In re M.W.*, 386 Ill. App. 3d 186, 199 (2008) (finding that a failure to make sufficient progress on recommended services prior to reunification is a basis for finding a parent unfit and unable to parent a minor).

¶ 25    Here, we find that the circuit court's decision to make J.S. a ward of the court is not against the manifest weight of the evidence. Waters testified that she had the opportunity to assess respondent for services and found that she needed individual therapy, a psychiatric evaluation, parenting classes, and domestic violence classes. Waters had not been able to verify that the

therapist respondent obtained on her own was sufficient. A referral for a psychiatric evaluation at a hospital chosen by respondent was going to made within 30 days of the dispositional hearing. The circuit court concluded that respondent abused or neglected J.S. due to an injurious environment and respondent was still in need of individual therapy and domestic violence services at the time of J.S.'s birth. Regardless of whether respondent was referred to services as quickly as possible, it is undisputed that individual therapy, a psychiatric evaluation, parenting classes, and domestic violence classes were all recommended, and there was no showing that respondent had made substantial progress—or any progress at all—toward completing those services at the time of the dispositional hearing. These facts support the circuit court's conclusion that, at the time of the dispositional hearing, respondent was not able to parent J.S. The circuit court's judgment was not against the manifest weight of the evidence, and we therefore affirm the circuit court's dispositional order.

¶ 26                        III. CONCLUSION

¶ 27    For the foregoing reasons, the judgment of the circuit court is affirmed

¶ 28    Affirmed.