# Illinois Official Reports

## Appellate Court

---

### *In re Marianna F.-M.*, 2015 IL App (1st) 142897

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARIANNA F.-M., a Minor, Respondent-Appellant (The People of the State of Illinois, Petitioner-Appellee, v. Oscar F., Respondent-Appellee). |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-2897 |
| Filed | May 8, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-JA-551; the Hon. Andrea M. Buford, Judge, presiding. |
| Judgment | Reversed in part; vacated in part; and remanded. |
| Counsel on Appeal | Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain, of counsel), for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Nancy Kisicki, Assistant State's Attorneys, of counsel), for the People.<br><br>Stephen Jaffe, of Chicago, for appellee. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court with opinion.<br>Presiding Justice Palmer and Justice Gordon concurred in the judgment and opinion. |

**OPINION**

¶ 1       Respondent Oscar F. is the natural father of the minor Marianna F.-M. In May 2014, Marianna was placed in the custody of the Illinois Department of Children and Family Services (DCFS). After a September 2014 adjudicatory hearing, the circuit court found that Marianna was abused and neglected and that Oscar was the perpetrator of the abuse and neglect. The court held a dispositional hearing the same day. At the conclusion of the hearing, the court found Oscar fit, willing, and able to parent Marianna and returned Marianna home to Oscar under an order of protective supervision. The Cook County public guardian, Marianna's court-appointed attorney and guardian *ad litem*, filed a timely notice of appeal from the court's dispositional orders. For the following reasons, we reverse the court's order returning Marianna home, vacate the order of protection, and remand for further proceedings.

¶ 2       On May 23, 2014, the State filed a petition for adjudication of wardship and a motion for temporary custody on behalf of Marianna, born June 5, 2008, to Oscar F. and Natalie M.[1] The petition alleged that Marianna was abused in that her parent or a person who is in the same household as Marianna created a substantial risk of physical injury to her and inflicted excessive corporal punishment, and she was neglected because she was living in an environment injurious to her welfare. As a result, Marianna was taken into custody on May 21, 2014, at 12:30 p.m. The petition further alleged that Marianna had been abused and neglected specifically because:

> "On or about April 28, 2014 this minor was observed to have several bruises on her arms and shoulders. Putative father had several different explanations as to how this minor was injured. Per medical personnel the history provided by the family is not consistent with the bruising observed. Medical personnel state that this minor had symmetrical bruising to her shoulders and forearms. Medical personnel state that this minor's bruising was due to non-accidental trauma. This minor reports putative father had previously grabbed her by the arms and 'squished' her."

The petition further noted that Natalie M. had not been involved in Marianna's life since June 2013 and the DCFS had been unable to contact Natalie M. Attached in support of the petition was an affidavit from Aracely Madrigal, the investigator, who stated that the family denied knowing how Marianna was injured and denied causing the injuries, but also failed to "provide a plausible explanation" to how Marianna received the injuries.

¶ 3       On May 23, 2014, the court appointed the Cook County public guardian as the attorney of record and guardian *ad litem* (GAL) for Marianna. The court also found that immediate and urgent necessity existed to remove Marianna from her home based on a stipulation to the facts in the petition. Marianna was placed in the custody of the DCFS guardianship administrator and Oscar F. was granted limited supervised visitation.

¶ 4       On June 12, 2014, the court entered a finding that Oscar was the father of the minor based on his Oscar's own admission.

---

[1]According to the parties and per the record, Natalie M. never appeared in court on this case, was found unfit and unwilling to parent Marianna at the conclusion of the dispositional hearing, and is not a party to this appeal.

¶ 5        On September 16, 2014, at the adjudicatory hearing, the parties entered into a written stipulation of facts. The parties stipulated that, if called, Aracely Madrigal, a DCFS child protection investigator, would testify that on April 28, 2014, she was assigned to investigate an allegation of risk of harm involving Marianna. On or about that date, Madrigal had an in-person conversation with Marianna at Marianna's home, during which Madrigal observed and took pictures of the bruising on Marianna's arms and shoulders. At the time, Marianna was living with Oscar, Ernestina P., the woman Oscar resided with, and Ernestina's daughter. Marianna said that when she misbehaves at home, her father spanks her "hard, all over her body" and that she is "hit with an open hand on the back." Marianna also said that her "mother" hits her with a belt, that the babysitter does not hit her, and that she did not know how she received the marks on her arms. According to the stipulation, Madrigal "tried to engage [Marianna] several times about how she obtained the marks on her [arms], but [Marianna] would not disclose any information." After observing the bruising on Marianna's arms, Madrigal told Oscar to take Marianna to the hospital. Marianna was admitted to Advocate Illinois Masonic Medical Center (Advocate) on April 28, 2014, and discharged the following day.

¶ 6        Madrigal also had an in-person conversation with Oscar on April 28, 2014, during which he said that Marianna had been living in his care since June 2013 when her biological mother was arrested. Oscar said that Marianna's mother had visited once since June 2013, but she was not in contact with Marianna and he has no way to contact Marianna's mother because "she is homeless and uses illegal drugs." Oscar admitted to hitting Marianna with an open hand but did not know what happened to her arms. He said the injuries could have been caused by the babysitter or by Ernestina's daughter, "who is aggressive." He also said that Ernestina cares for Marianna and can be "a bit aggressive" with Marianna, though not abusive. Madrigal had another in-person interview with Oscar on May 21, 2014, during which she told Oscar that Marianna was being taken into protective custody. Madrigal also told Oscar that she was concerned because Marianna's caretakers, Oscar and Ernestina, "did not know what happened" to Marianna and because when they were made aware of Marianna's bruises, they did not seek medical treatment. At the close of the investigation, Madrigal indicated[2] Oscar for cuts, bruises, welts, abrasions, and oral injuries.

¶ 7        The parties further stipulated that, if called, Dr. Adia George, a physician employed by Advocate, would testify that she was involved in caring for Marianna when Marianna was admitted to the hospital in April 2014. Marianna was admitted for an evaluation of arm bruising and on or about April 29, 2014, George had an in-person conversation with Marianna and the hospital social worker through interactive play at Advocate. Oscar and Ernestina's explanation for Marianna's bruises changed once Marianna was admitted to the hospital; they said that Marianna's injuries were the result of being restrained on a papoose used at a recent visit to the dentist. When George spoke to Marianna, at first she said her injuries were due to a fall. Eventually Marianna said that the bruises were a result of her father "squishing" her. When asked what she meant by "squishing," Marianna demonstrated on a toy teddy bear by squeezing the bear's arms. In George's medical opinion, Marianna's bruising injuries were the

_____

[2]Section 3 of the Abused and Neglected Child Reporting Act defines an "indicated report" as "a report made under this Act if an investigation determines that credible evidence of the alleged abuse or neglect exists." 325 ILCS 5/3 (West 2012).

result of nonaccidental trauma because: the bruising was "in symmetric distribution over both arms"; it was in different stages of healing and different colors; it was in nonprominent areas of the arm, such as over the shoulder and extending under the armpit; Marianna's injuries were inconsistent with the explanation of the cause (a papoose at the dentist's office) provided by Oscar and Ernestina; and the explanation for Marianna's injuries from Oscar and Ernestina changed while Marianna was at the hospital.

¶ 8    The parties also stipulated that two exhibits would be admissible at an adjudication hearing, including Marianna's medical records from Advocate and photos taken of Marianna on April 28, 2014, by the DCFS investigator.

¶ 9    The same day, the court entered an order of adjudication finding that Marianna was abused or neglected as defined in section 2-3 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2012)). Specifically, the court found that Marianna was subject to a lack of care, substantial risk or physical injury, and excessive corporal punishment because she "had several bruises on her arms and shoulders" as the result of abuse or neglect inflicted by her father. The court also ordered that the disposition hearing would be held *instanter*.

¶ 10    At the disposition hearing, the State entered three exhibits into evidence: an integrated assessment (IA) report, a service plan, and the Juvenile Court Assessment Program (JCAP) drug/alcohol evaluation for Oscar.

¶ 11    The IA report was completed on July 21, 2014, by Iris Burgos and Cilvia Garcia. According to the IA report, Marianna lived with Oscar, Ernestina, and Ernestina's daughter, Nataly L. The case had come to the attention of DCFS on April 28, 2014, after bruises were seen on Marianna's arms, shoulders, and upper thigh. George Martinez, the caseworker at the time, and Cilvia Garcia, an IA clinical screener, interviewed Oscar in Spanish on June 23, 2014, at Oscar's apartment. Oscar said that his relationship began with Ernestina in June 2013 and he and Ernestina had been co-parenting Marianna and Nataly. However, after Marianna was placed in his care, he left most of the parenting to Ernestina. Up until 2013, Natalie M., Marianna's natural mother, had been Marianna's primary caretaker. However, in April 2013, the police called Oscar and told him to pick up Marianna because Natalie M. had been arrested for drug possession. Oscar and Natalie M. had a relationship from 2007 through 2013 but their relationship was poor due to substance use, financial mismanagement, physical abuse, and neglect of Marianna. Oscar admitted drinking two or three beers per day on weekends and one beer with his meals during the week. He also said that there were "several occasions where he has become inebriated and where he has loss [*sic*] time from work for alcohol use" but the last time he was inebriated was six months prior. Oscar said he became inebriated after having 12 cans of beer. The IA report recommended another substance abuse evaluation due to his high tolerance and family reports of how he acted after drinking beer. The IA report observed that Oscar presented as "depressed and anxious." Further, Oscar became angry during interactions with a DCFS investigator during the investigation. Oscar admitted to spanking Marianna when he was upset with her but denied causing the injuries that brought the case to the attention of the DCFS and "family accounts indicate that when frustrated with Marianna's behavior he would 'squeeze' Marianna." Oscar said his feelings of depression, irritability, and worry began when Marianna was placed in his care. He said that Marianna's persistent crying and asking to be returned to her mother and Marianna's disobedience caused his mood symptoms. The IA report noted that Oscar was "open to participating in all treatment in order to reunify with his daughter" but also observed that Oscar's "belief that he did not 'cause any harm to his

daughter' may limit his progress with recommended treatment." The IA report further observed:

> "At this time, [Oscar's] understanding of parenting is a concern due to a lack of knowledge of how to build a supportive relationship with Marianna, lack of understanding Marianna's emotional needs, limited knowledge of parenting techniques, and his own poor parental role models. [Oscar] demonstrated having limited empathy and/or understanding of Marianna's need for emotional support from him. *** When he did engage in efforts to parent Marianna, he would become easily frustrated and overwhelmed and either ignored her behavior or repond[ed] in a punitive manner. *** [Oscar] will need intervention that will teach him new parenting skills and will need close guidance on how to effectively implement skills learned, as well as guidance on how to foster his daughter's emotional and social well being.

> \* \* \*

> At this time, [Oscar's] emotional and behavioral functioning is moderately impaired. He appears to have problems with his mood which significantly impacts his ability to parent. Moreover, he appears to have limited parenting ability and his limited ability is significantly impacted by his emotional and cognitive challenges. He has difficulty coping with emotional stressors (his daughters [*sic*] needs, his daughter wanting to go home to her mother, and daughters [*sic*] other emotional needs) and with regulating his behavioral responses which is impacting his ability to safely parent and to form supportive relationship[s]."

¶ 12    The IA report recommended that Oscar engage in: (1) a substance abuse assessment because he "reported having a high tolerance for alcohol, which may suggest that he is drinking more than he is reporting" and because "family accounts suggest that Marianna has witnessed [Oscar] intoxicated"; (2) individual psychotherapy "to stabilize trauma and mood symptoms"; (3) parenting classes "to gain knowledge of parenting skills"; (4) parenting coaching services "to improve his relationship with [Marianna] and effectively meet her emotional and behavioral needs"; (5) supervised visitation; and (6) couples therapy with Ernestina.

¶ 13    According to the IA report, Martinez and Garcia also interviewed Ernestina in Spanish on June 23, 2014. The IA report indicated that "[d]espite medical findings that the injuries were the result of abuse, [Ernestina] continues to view Marianna's injuries as accidental." Ernestina made statements suggesting that Marianna was a difficult child and Ernestina was frustrated by Marianna's problematic behavior as well as the limited assistance she received from Oscar in caring for Marianna. Ernestina had been caring for Marianna for the past year most weekdays after work and on weekends. "The quality of the relationship was poor." The IA report said that Ernestina needed to be more empathetic with Marianna's emotional needs and that, although Ernestina was consistent in her parenting technique, her manner of addressing Marianna's behavior "was at times punitive instead of encouraging." Ernestina addressed Marianna's misbehavior with corporal punishment such as spanking and by removing privileges. The IA report also observed that Ernestina's parenting approach "is a concern due to lack of understanding of how to appropriately meet and respond flexibly to Marianna's emotional needs due to beliefs that her approach is correct and has improved Marianna's behavior" and that it "likely caused Marianna more emotional stress leading for [*sic*] some of her problematic behaviors to continue."

¶ 14    The IA report recommended that Ernestina engage in: (1) individual psychotherapy "to stabilize mood symptoms and change problematic beliefs"; (2) parenting classes "to increase knowledge of effective parenting skills"; (3) parenting coaching services "to effectively implement parenting skills learned with Marianna," sometimes together with Oscar "to assess problems that this dynamic may cause and provide feedback"; and (4) supervised visitation.

¶ 15    According to the IA report, Martinez and Garcia also interviewed Marianna on June 23, 2014, in her preferred language of English. Marianna reported that both Oscar and Ernestina used corporal punishment to discipline her. She said that Oscar would "spank her and squeeze and shake her" and Ernestina would "spank her and whip her with a belt." She said her parents' form of discipline "would make her sad." Marianna also said that she had witnessed her biological parents arguing "often" and saw her biological mother physically attack Oscar once, while they were still in a relationship. She has witnessed Oscar drink alcohol and become inebriated on more than one occasion. The IA report concluded that Marianna's mood symptoms, sadness, hurt, disappointment, and irritability, and aggressive responses were related to the physical abuse she has experienced, being bullied by classmates and her stepsister, and being apart from her family. The report also noted that Oscar and Ernestina were "currently not able to meet [Marianna's] emotional needs or provide support." Marianna told two different professionals that Oscar caused her injuries. The IA report recommended that Marianna engage in: (1) play therapy "to stabilize mood and trauma symptoms"; and (2) family therapy with Oscar "to improve their relationship and enhance Marianna's father's ability to foster Marianna's emotional and social functioning" once it was deemed appropriate by their respected individual therapists.

¶ 16    The IA report concluded that the prognosis was poor and it was "very unlikely that [Oscar] will reunify with Marianna within a year." The report continued:

> "The prognosis is due to Marianna's unexplained injuries and [the fact that] no caregiver, including [Oscar], admitted to the abuse. He provided explanations for the injuries, indicating he knew of the injuries, but medical examination does not support his statements. He is not taking the appropriate responsibility for the reason the case came into care and has a history of becom[ing] oppositional with helping professionals. It would be dangerous to Marianna to be placed in his care unless he acknowledges that he needs to address his mental health, including anger, and improve his parenting. At this time he is not acknowledging the need to address either significant problem. As he participates in services and progress is made, the prognosis may be revisited."

¶ 17    The family service plan, initiated July 20, 2014, noted that Oscar and Ernestina were referred to Casa Central for parenting skills classes and to Mary & Tom Leo Associates, Inc. (MTLA), for individual therapy, and recommended that Oscar and Ernestina engage in couples therapy. The plan recommended that Marianna attend play therapy to address "themes of abuse, neglect, and violence." The plan also recommended that Oscar and Marianna be referred to family therapy "when is deemed appropriate" to "[i]mprove communication and help [Marianna's] father develop more appropriate ways to cope with Marianna's emotional difficulties." Ernestina was to attend individual therapy to address the frustration and stress caused by her caring for Marianna and then, when therapeutically appropriate, she too was to participate in family therapy. In addition, the plan recommended that Oscar attend parenting coaching with Marianna "when deemed appropriate by the parent coach" and complete a substance abuse assessment and follow any recommendations.

¶ 18    According to the JCAP drug/alcohol evaluation, dated June 12, 2014, Oscar said that he started drinking alcohol when he was 16 years old and had continued drinking two 12-ounce cans of beer once a month. He denied progression. Based on Oscar's report, he did not meet the criteria for substance abuse treatment. However, the assessor who completed the report recommended that Oscar "be monitored via random toxicology screenings and/or breathalyzers" and that JCAP should be notified immediately if he ever tested positive in order to be placed in referral services.

¶ 19    The State presented one witness. Iris Burgos, a case manager for DCFS, testified that she was assigned to Marianna's case on July 8, 2014, and assessed the parties for services. Burgos assessed Oscar for individual therapy, family therapy, couples therapy, substance abuse, parenting skills classes, and parenting coaching. Burgos referred Oscar to MTLA for individual therapy on July 15, 2014. However, at the time of the dispositional hearing, Oscar had not begun individual therapy because he was on the waiting list for a Spanish-speaking therapist. Burgos testified that MTLA indicated Oscar would begin therapy soon, maybe in "one more week." He would attend individual therapy sessions once a week. Oscar would begin family therapy once his individual therapist said it was okay to begin family therapy, and would begin couples therapy after family therapy was completed. In addition, Burgos referred Oscar to Healthcare Alternative Systems for a substance abuse assessment on the day of the hearing, which would take place within a week. Burgos said that she would follow up with any recommendations made from the substance abuse assessment.

¶ 20    Burgos also referred Oscar to parenting skills classes on July 15, 2014, and Oscar began classes at Casa Central on July 18, 2014. Oscar was consistently attending classes once a week and was making progress. Oscar had one more week of parenting classes, and once he completed them, he would begin parenting coaching.

¶ 21    Burgos assessed Ernestina for services as well, including individual therapy, couples therapy, parenting skills classes, and parenting coaching. Burgos referred Ernestina for individual therapy at MTLA on July 15, 2014, and Ernestina was due to attend therapy sessions once a week beginning the week of the hearing. Ernestina would participate in family and couples therapy after she completed individual therapy. Burgos also referred Ernestina to Casa Central for parenting skills classes and Ernestina began classes on July 18, 2014. Ernestina consistently attended classes and was making progress. Once Ernestina completed the parenting skills classes, she would begin parenting coaching.

¶ 22    Burgos further testified that Marianna was presently residing in a foster home with a relative where she had been placed on August 13, 2014. During Burgos's last visit to the home, she found that the home was safe and appropriate and there were no signs of abuse, neglect, corporal punishment, risk of harm, or any unusual incidents. At the time of the hearing, Oscar had visitation with Marianna three times per week, for two hours each, supervised by Marianna's foster mother. Oscar was consistent with his visits and Marianna's foster mother told Burgos that Oscar was "very appropriate" and "very caring and very nurturing" with Marianna. Ernestina accompanies Oscar while visiting Marianna "most of the times." Burgos also testified that Marianna had begun attending weekly play therapy sessions at MTLA the week prior. Because Marianna, Oscar, and Ernestina would all attend therapy at the same agency, their therapists would be able to consult with each other regarding when it would be appropriate to begin family sessions. Ultimately, Burgos recommended that temporary custody be vacated and that Marianna be adjudged a ward of the court and placed in the guardianship of

Debra Drye-Webster to "give the opportunity to [Oscar] to do the service that he needs and to Marianna to attend her play therapy."

¶ 23 In closing, the State acknowledged that both Oscar and Ernestina had attended and made progress in their parenting skills classes. The State also noted that Oscar had not yet begun in any of the other recommended services, including individual therapy, family therapy, and a substance abuse assessment, and that Ernestina had only begun individual therapy the week before. The State argued that "the parties need time to engage in services and make progress towards correcting the conditions as to why this case came into the system." The State requested that the court adjudge the minor a ward of the court, appoint the DCFS guardianship administrator as Marianna's guardian, and find Oscar was unable to parent Marianna. The GAL requested the same findings.

¶ 24 Oscar's attorney noted that Oscar had "participated in everything that he's been able to participate in." He had attended the parenting skills classes and had no control over when his therapy would begin.

¶ 25 The circuit court found Oscar to be willing and able to parent Marianna, vacated the temporary custody order, and returned Marianna to Oscar's home with an order of protection. The court told Oscar it was returning Marianna to him because "services have been offered to you; and through no fault of your own, you have not been able to go through with them."

¶ 26 The GAL requested a factual basis for the court's findings, noting that Oscar still needed to engage in individual therapy, parenting coaching, couples therapy, and family therapy, and that he had "not addressed any of the reasons why the case came in." The GAL also pointed out that the court had made an adjudication finding of abuse that same day and asked that the court "indicate the factual basis for why it's safe at this time, despite the fact [Oscar] hasn't engaged in any of the services, other than a weekly parenting class, and hasn't address[ed] the specifics of why Marianna's case came in." The GAL argued that although Oscar was "willing to do everything he needs to do," he was not able to care for Marianna, and again asked the court to find him unable to parent.

¶ 27 Oscar's attorney responded that Oscar had engaged in parenting skills classes and that his visits with Marianna had gone well. Oscar's attorney argued that the parenting skills classes "probably addressed" the inappropriate and excessive corporal punishment "to a certain extent." He also noted that there was "much more to do *** to assure that the behavior won't be repeated" but was confident that, with the order of protection and the recommended services being a condition of the court's order, Oscar would comply with all the recommendations.

¶ 28 The GAL again acknowledged that Oscar was willing to do whatever he was asked to do, but that he had not addressed any of the "very serious reasons" why the case came in. She also noted that Oscar had only participated in supervised visits and has not been with Marianna alone. She again argued that it was in Marianna's best interest to have the necessary clinical information to ensure that she was safe and, because Oscar had not been able to engage in all the necessary services, it was premature and unsafe for Marianna to live with him.

¶ 29 The court again found that it was in Marianna's best interest to be returned to her father's home under an order of protection. It explained:

> "The father has taken, or started, the parenting classes, as has [Ernestina, whom] he lives with. ***

From what I have looked at here today and the testimony that I have heard today, I think the father is–understands the inappropriateness of what happened in the home and that he will be able to provide at this point a safe and stable home with the assistance and help of the services that have been ordered. I have also taken into consideration that the Department staffed this matter and that was their recommendation, as well."

¶ 30　　The GAL requested a stay of the circuit court's orders returning Marianna home to Oscar. The court granted the stay in a written order which stated that order and related order of protection granted pursuant to section 2-24 of the Juvenile Court Act were stayed pending final resolution of the appeal. Marianna remains in the temporary custody of DCFS guardianship administrator pursuant to the court's May 23, 2014, order.

¶ 31　　On appeal, Marianna contends, and the State agrees, that the circuit court's finding that Oscar was fit and able to parent Marianna was against the manifest weight of the evidence. For the following reasons, we agree.

¶ 32　　According to section 2-21(2) of the Act, if a court finds that a minor is abused or neglected, it shall set a time within 30 days after the entry of the finding for a dispositional hearing to be conducted pursuant to section 2-22 of the Act. 705 ILCS 405/2-21(2) (West 2012). Section 2-22(1) of the Act provides that, at a dispositional hearing, the circuit court "shall determine whether it is in the best interests of the minor and the public that he be made a ward of the court" and then, if the minor is made a ward of the court, the court "shall determine the proper disposition best serving the health, safety and interests of the minor and the public." 705 ILCS 405/2-22(1) (West 2012). After the court adjudges a minor a ward of the court, it must determine whether the minor's parents are unfit or unable to "care for, protect, train or discipline the minor" or are unwilling to do so; and whether the health, safety and best interest of the minor will be jeopardized if the minor remains in the custody of her parents. 705 ILCS 405/2-27(1) (West 2012). However, where a court finds the minor to be neglected or abused under section 2-3 of the Act, and the acts or omissions of the parent are identified as the basis for the court's finding of abuse or neglect, custody of the minor shall not be restored to that parent until a hearing shows that the parent can care for the minor without endangering her health or safety. 705 ILCS 405/2-23(1)(a) (West 2012); see also 705 ILCS 405/2-28(4) (West 2012).

¶ 33　　The guiding principles when the court issues a dispositional order about a minor's custody and guardianship are the health, safety, and best interests of the minor. *In re Austin W.*, 214 Ill. 2d 31, 46 (2005). "The best interests of the child is the paramount consideration to which no other takes precedence." *Id*. In determining a child's best interest, the court should examine the statutory best interest factors, including whether or not the dispositional order provides for a child's physical safety and welfare. *In re Desiree O.*, 381 Ill. App. 3d 854, 866 (2008); 705 ILCS 405/1-3(4.05)(a) (West 2012).

¶ 34　　A trial court's dispositional ruling must be supported by a preponderance of the evidence. *In re Star R.*, 2014 IL App (1st) 140920, ¶ 30. The circuit court's determination in a child custody case will not be disturbed unless the determination is against the manifest weight of the evidence. *Id*. A decision is against the manifest weight of the evidence " 'only when an opposite conclusion is clearly apparent.' " *Id*. (quoting *In re J.J.*, 327 Ill. App. 3d 70, 77 (2001)). In addition, a parent's compliance with recommended services and a willingness to be a good parent is not dispositive of a finding that that parent was fit and able. See *In re April C.*,

326 Ill. App. 3d 225, 241 (2001) (affirming the circuit court's finding that the parent was unable, unwilling, and unfit to care for his children despite his participation in recommended services because "there was ample evidence that respondent continues to *** be a threat to the children's safety, and respondent has not made sufficient progress in a number of areas").

¶ 35    Here, we find that the court's finding that Oscar was fit and able to parent Marianna and returning Marianna to Oscar's custody was against the manifest weight of the evidence. At the adjudication hearing, the court concluded that Marianna was abused due to excessive corporal punishment and a substantial risk of physical injury caused by her father, Oscar. The court based its ruling on the doctor's opinion that Marianna's injuries were nonaccidental and her bruising was inconsistent with Oscar's explanation for her injuries. The court also found Marianna was neglected based on Oscar's delay in taking her to the hospital for her injuries.

¶ 36    The IA report showed that Oscar presented as anxious and depressed and that his emotional and behavioral functioning was moderately impaired. In addition, the IA report observed that Oscar's "understanding of parenting is a concern due to a lack of knowledge of how to build a supportive relationship with Marianna, lack of understanding Marianna's emotional needs, limited knowledge of parenting techniques, and his own poor parental role models." It noted that Oscar became easily frustrated and overwhelmed with Marianna and "either ignored behavior or [responded] in a punitive manner." The IA report also said that Oscar's problems with mood significantly impacted his ability to parent Marianna and his difficulty coping with emotional stressors impacted his ability to safely parent and to form a supportive relationship. The IA report's prognosis predicted that it would be "very unlikely" that Oscar would reunify with Marianna within a year and said that it "would be dangerous to Marianna to be placed in his care unless he acknowledges that he needs to address his mental health, including anger, and improve his parenting." The IA report recommended that Oscar engage in: a substance abuse evaluation and treatment if necessary; individual therapy and a psychiatric evaluation for medication if recommended; supervised visits; couples therapy; family counseling with Marianna. However, Burgos's testimony at the dispositional hearing showed that Oscar was not yet engaged in most of the recommended services. At the time of the hearing, Oscar had almost completed his parenting skills classes and was due to begin parenting coaching, but he had yet to begin any individual therapy. Marianna had just begun play therapy a week before the hearing and Ernestina was due to begin individual therapy the week of the hearing. Oscar and Ernestina would not be able to begin couples therapy or participate in family therapy with Marianna, both recommended services, until their individual therapists gave approval. In addition, Oscar had not yet undergone the substance abuse assessment at the time of the hearing, which was important in light of Oscar's admissions that he became inebriated on several occasions and Marianna's report that she had seen Oscar drink and become inebriated on more than one occasion. We acknowledge that Oscar was unable to begin individual therapy, family therapy, couples therapy, or parenting coaching before the hearing "through no fault of his own"; nonetheless, that does not negate that these services were recommended in order to ensure that Oscar could safely reunify with Marianna.

¶ 37    Furthermore, there is no evidence that Oscar took responsibility for the excessive corporal punishment that Marianna suffered. Both Oscar and Ernestina consistently denied causing Marianna's injuries. The IA report noted that Oscar did not believe he caused any harm to Marianna despite reports that he would shake and squeeze Marianna when he became frustrated. Also according to the IA report, Ernestina believed Marianna's bruises were

- 10 -

accidental. The IA report concluded that Oscar and Ernestina were not currently able to meet Marianna's emotional needs or provide support and, as noted above, at the time of the hearing neither Oscar nor Ernestina had started individual, family, or couples therapy. Under these circumstances, we find that the trial court's determination that Oscar was fit and able to parent Marianna was against the manifest weight of the evidence.

¶ 38    *In re M.W.*, 386 Ill. App. 3d 186 (2008) supports our conclusion. There, after an adjudication hearing, the circuit court found M.W. to be neglected based on the past abuse of an older half-sibling, D.J., and based on the fact that M.W.'s mother, Lori B., had discontinued the services recommended to her previously when she surrendered her parental rights to D.J. *Id.* at 192-93. At the dispositional hearing, the State submitted the IA report, which showed that Lori B.'s prognosis for reunification with M.W. was poor. *Id.* at 193. A DCFS caseworker testified that, in accordance with her assessed services, Lori B. attended biweekly domestic violence services and individual counseling twice a week, visited M.W., and that she complied with monthly random urine testing. *Id.* at 194. He also testified that Lori B. had been recently referred to psychotherapy twice a week. *Id.* The caseworker further testified that Lori B. was "affectionate with M.W. and acted appropriately during their visits" and that she had seen M.W. every day, unsupervised, for five hours per day, from October 2007 to mid-March 2008 with no unusual incidents. *Id.* However, the caseworker recommended that M.W. not be returned home to Lori B. because Lori B. needed to be involved in services longer. *Id.* at 194-95. The circuit court found Lori B. fit, willing, and able to care for M.W., and returned M.W. to the care and custody of Lori B. under an order of protective supervision. *Id.* at 195.

¶ 39    On appeal, M.W. and the State argued that the circuit court's finding that Lori B. was able to care for and protect M.W. "was contrary to the manifest weight of the evidence where M.W. was found neglected due to an injurious environment and Lori B. needed to make progress in therapy." *Id.* at 198. The reviewing court agreed, finding that the evidence established that Lori B. was unable to safely care for and protect M.W. and that reunification was not in M.W.'s best interest. *Id.* at 199. The court noted that DCFS had recommended that Lori B. needed to complete therapy before M.W. would be safe in her care and that, as of the date of the disposition, Lori B. had not made sufficient progress in her services. *Id.* The court also observed that although the evidence showed that Lori B. and M.W. had an emotional bond and that Lori B. cared for M.W. appropriately, she had unresolved psychological issues and the IA report had noted that the prognosis for reunification was poor. *Id.* at 199-200. The reviewing court reversed the dispositional order because "Lori B. had not made sufficient progress in therapy and counseling to deal with the psychiatric disorder that had prevented her from protecting D.J." *Id.* at 200.

¶ 40    Here, the IA report noted that Oscar had difficulty parenting due to problems with his mood and difficulty coping with emotional stressors. In addition, although Oscar was willing to complete the required services, at the time of the hearing Oscar had not completed most of the recommended services: he had yet to begin individual therapy, family therapy, or couples therapy, and had not yet begun parenting coaching or completed the substance abuse assessment. Ernestina also had not started individual therapy, family therapy, couples therapy, or parenting coaching. Marianna had started play therapy just that week. Although Oscar was "very appropriate" and "very caring and nurturing" with Marianna during visits, at the time of

the hearing, all of Oscar's visits had been supervised.[3] Finally, the IA report noted that the prognosis for reunification was poor because Oscar refused to take responsibility for the reason the case came to court. Therefore, similar to the court in *M.W.*, we conclude that Oscar has not made sufficient progress in therapy to deal with his difficulties parenting Marianna and therefore was not fit or able to parent Marianna.

¶ 41        Moreover, we note that the circuit court based its judgment on an erroneous interpretation of fact. Where a circuit court's discretion has been exercised based on an erroneous interpretation of fact, its decision is subject to keener scrutiny by a reviewing court. *In re J.O.*, 269 Ill. App. 3d 287, 291 (1995).

¶ 42        In *J.O.*, after a hearing, the circuit court denied the State's motion to transfer the juvenile defendant to the adult criminal system. *Id.* at 288. On appeal, the reviewing court noted that although the defendant's probation officer did not make a recommendation about the juvenile defendant's placement, in making its conclusions at the end of the hearing, the circuit court stated that the probation officer had recommended that the juvenile defendant not be transferred to the adult system. *Id.* at 290-91. Ultimately, the court found that the circuit court made an erroneous interpretation of fact and, in view of the evidence presented, concluded that the circuit court abused its discretion. *Id.* at 292.

¶ 43        Here, in reaching its finding that Oscar was fit, willing, and able to parent Marianna, and its decision to return Marianna home, the circuit court said that it had "also taken into consideration that the [DCFS] staffed this matter and that was their recommendation." However, when testifying, Burgos did not recommend that Marianna be returned home. She specifically recommended that Marianna be placed in the guardianship of the DCFS guardianship administrator to "give the opportunity to [Oscar] to do the service that he needs and to Marianna to attend her play therapy." Because the circuit court based its conclusions, at least in part, on an erroneous interpretation of Burgos's recommendation, the circuit court's conclusions are subject to keener scrutiny. Furthermore, as we discussed above, the remainder of the evidence at the dispositional hearing did not support the court's conclusion that Oscar was fit and able to parent Marianna. Accordingly, the circuit court's dispositional order and order returning Marianna to Oscar's care under an order of protective supervision were against the manifest weight of the evidence.

¶ 44        For the forgoing reasons, we reverse the circuit court's September 16, 2014, dispositional order, vacate the section 2-24 order of protective supervision, order that Marianna be placed in the guardianship of the DCFS guardianship administrator, and remand for further proceedings.

¶ 45        Reversed in part; vacated in part; and remanded.

---

[3]According to Marianna's reply brief, on January 30, 2015, after a hearing including testimony from the DCFS caseworker and Oscar's individual therapist, the circuit court allowed unsupervised day visits at the discretion of DCFS.