# Illinois Official Reports

## Appellate Court

---

### *In re N.C.*, 2021 IL App (1st) 210141

---

| | |
|---|---|
| Appellate Court Caption | *In re* N.C. and J.C., Minors-Appellants (The Department of Children and Family Services, Petitioner-Appellant, v. Z.C. and B.C., Respondents-Appellees). |
| District & No. | First District, Second Division<br>No. 1-21-0141 |
| Filed | October 12, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 20-JA-1106, 20-JA-1107; the Hon. John Huff, Judge, presiding. |
| Judgment | Reversed in part, vacated in part, and remanded with directions. |
| Counsel on Appeal | Kwame Raoul, Attorney General, of Chicago (Paul A. Racette, Assistant Attorney General, of counsel), for appellant Department of Children and Family Services.<br><br>Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Mary B. Hayes, of counsel), for other appellants.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (John E. Nowak and Gina DiVito, Assistant State's Attorneys, of counsel), for the People.<br><br>John C. Benson, of Chicago, for other appellees. |

Panel                    PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Lavin and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1     The appellant Illinois Department of Children and Family Services (DCFS), via the Attorney General of the State of Illinois, along with minors/respondents-appellants N.C. and J.C. (minors or as named), via the Office of the Cook County Public Guardian, appeal from those portions of the dispositional order entered in the instant cause by the juvenile court finding mother and respondent-appellee Z.C. (Mother) fit, willing, and able to care for the minors and ordering their immediate return to her care and custody.[1] Both DCFS and the minors ask that we reverse and vacate these portions of the dispositional order, and the Public Guardian additionally asks that we remand the cause to the trial court with directions that it enter a new dispositional order finding Mother unable to parent the minors at this time and ordering them to be placed in DCFS custody.

¶ 2     The State has filed an appellee brief in this matter declaring, in complete concession with DCFS and the minors, that the juvenile court's finding that Mother was fit, willing, and able to parent is contrary to the manifest weight of the evidence and that its order of immediate return is an abuse of discretion. Agreeing wholly with the Attorney General and the Public Guardian and explicitly adopting the Public Guardian's brief and prayer for relief on appeal, it likewise asks that we reverse the juvenile court's findings and remand with instructions for entry of a new dispositional order finding Mother unable to care for the minors at this time.

¶ 3     Father and respondent-appellee B.C. (Father) has filed a legally and substantively scant brief in this matter, summarily insisting that the trial court's dispositional order was proper and, accordingly, stating that it "must stand." Mother, meanwhile, has not filed an appearance in this cause nor a brief on appeal.

¶ 4     For all the reasons discussed below, we agree with the Attorney General, the Public Guardian, and the conceding State, and we reverse those portions of the juvenile court's dispositional order finding Mother fit, willing, and able to care for the minors and ordering their immediate return to her care, and we remand with directions that a new dispositional order be entered finding Mother unable to parent the minors at this time and ordering them to be placed in DCFS custody.[2]

---

[1]The Attorney General and the Public Guardian have filed separate appearances and appellate briefs in this cause.

[2]We note for the record that, on February 11, 2021, this court granted an emergency motion staying the trial court's order returning the minors to the care of Mother and, instead, ordered that they remain in substitute care pending appeal. Upon a motion for leave to correct the emergency motion, the stay was revisited on February 24, 2021, with this court ordering that it was to remain in effect. Thereafter, and in direct contravention to the explicit due dates declared by this court, Father was nonetheless allowed to file a late response to the emergency motion, and after considering that response and the emergency motion once again, this court, on March 2, 2021, upheld the stay. Accordingly, the minors have been and remain in substitute care.

BACKGROUND

¶ 6    First, foremost, and upon declaration in the briefs of all parties to this matter, we make clear for the record that none of them seek appeal, in any form or fashion, from the adjudication order entered by the juvenile court finding both N.C. and J.C. neglected and abused. Instead, the instant appeal arises only from the dispositional order entered by the juvenile court.

¶ 7    N.C. was born in April 2019, and J.C. was born in April 2020 to Mother and Father, their married biological parents, who resided together. At the time, Mother also had two other minor children from a previous relationship, who lived with Mother's sister and her sister's husband[3] pursuant to prior (and unrelated) DCFS involvement. In August 2020, the State filed petitions for adjudication of wardship of N.C. and J.C. Regarding J.C., then three months old, the petition alleged he had been neglected in that his environment was injurious to his welfare and he had been abused in that his parents inflicted or allowed to be inflicted significant physical injury upon him by other than accidental means and created a substantial risk of further such physical injury to him. Regarding N.C., then 15 months old, the petition alleged he had been neglected in that, in light of the abuse to J.C., his environment was injurious to his welfare and he was abused in that his parents created a substantial risk of physical injury.

¶ 8    The parties here agree that the factual basis for these petitions and the evidence presented in this cause are as follows. On July 26, 2020, Mother and Father brought J.C. to Silver Cross Hospital in New Lenox, Illinois, unresponsive. The next day, he was diagnosed with multiple injuries at different stages of healing, including fractures of the skull, wrist, femur, and ribs. He also had visible head and facial bruising and multiple subdural hemorrhages, and he suffered a resulting stroke. Hospital personnel opined that J.C.'s injuries were the result of child abuse and maltreatment. His injuries were so severe that he required a level of care higher than any Silver Cross could provide, so he was transferred to Lurie Children's Hospital in Chicago. Hospital personnel there deemed J.C. "critically ill" and placed him in the pediatric intensive care unit. They noted that, following hospitalization, J.C. would need to be discharged to an inpatient rehabilitation facility to undergo extensive therapy and that it was likely he will experience long-term effects from his injuries, including developmental delays. His physicians further noted there was a "very[ ] high" concern for J.C.'s "non-accidental trauma," there was "no plausible alternative accidental or medical diagnosis" to explain his injuries, and he was at "risk of repetitive and escalating abuse, including death."

¶ 9    Mother and Father both told hospital personnel they did not know how J.C. was injured. Upon being interviewed by a hospital social worker, both denied any domestic violence in their relationship or a history of involvement with DCFS, and they denied ever seeing bruises on J.C.'s body or that he had recently fallen or was dropped. Mother speculated she may have injured him while placing him in his bassinet, and Father told an attending physician J.C. has sensitive skin and he might have "mishandled" J.C. by holding him too close, and J.C. might have hit his head on the bathtub. They also told a DCFS investigator J.C. may have had a seizure they did not know about, which caused his injuries. However, treating physicians made clear J.C.'s history of injuries as reported by Mother and Father was implausible in light of the pattern of injuries they noted, and thus, they suspected physical abuse. And a physician

---

[3]It was discovered later that Mother's sister and her male partner were not legally married; however, throughout the majority of the record, they are referred to as husband and wife, and he is referred to as Mother's sister's "husband" and Mother's "brother-in-law."

assessment note of J.C. stated that many of his injuries are not those typically resulting from accidental means.

¶ 10     Later, in contradiction to her initial statements, Mother acknowledged there is a history of domestic violence between her and Father. She revealed that a physical altercation had occurred prior to J.C. being taken to the hospital, which had resulted in J.C. being thrown on the couch. She further revealed that, before the day in question, she had witnessed Father dropping J.C.'s car seat to the floor while he was inside and that Father had a history of hitting J.C. in the face. In contradiction to his initial statements, Father reported that he has seen Mother on at least two occasions shake J.C. He further claimed that she is very jealous and had physically abused him (Father).

¶ 11     In August 2020, the State filed petitions for adjudication of wardship for the minors and asked the juvenile court to give temporary custody to DCFS. The court agreed and then reaffirmed that ruling following a "re-temporary custody hearing," stating in its order that J.C.'s injuries were "horrific" and it was "also concerned about the safety of both minors." Mother then obtained an emergency order of protection against Father on her behalf and that of the minors.

¶ 12     As the minors' cause progressed, a stipulation of facts was entered into evidence. DCFS investigator Jacqueline Stanton would testify that Mother told her that, during the altercation between her and Father that resulted in J.C.'s hospitalization, Father took J.C. from her arms and threw him on the couch, whereupon J.C. hit the ground and Father prohibited her from picking him up. Mother also reported Father gets jealous when she visits her two older minor children. Stanton would further testify that Father reported he is the primary caregiver for N.C. while Mother is the primary caregiver for J.C. and that, while he did not hurt J.C., he has observed Mother shake him when he cried. Detective Casey Wall of the Orland Park Police Department, who was involved in the investigation of J.C.'s injuries, would testify to facts consistent with those already noted and, in addition, that Mother recounted to him past incidents where she saw Father holding J.C., who had blood on his lips, and that she had witnessed the same with Father and N.C., while Father told him Mother is "crazy sometimes." As it could not be determined which parent caused J.C.'s injuries, criminal charges were not pursued against either Mother or Father.

¶ 13     An integrative assessment report detailed that, according to Mother, the altercation at issue had resulted from her telling Father she wanted a divorce, whereupon he hit her and threatened to kill her and the minors. J.C. was hospitalized until August 18, 2020, and was transferred to an inpatient rehabilitation facility until September 14, 2020. He was then placed with Mother's sister and her husband. Father moved out of the family home but wanted to reconcile with Mother and have the minors returned to their care. He still denied injuring J.C., physically abusing Mother or N.C., and any domestic violence. Father expressed anger over being questioned about his involvement in J.C.'s injuries and stated that, if Mother did not inflict them, then they must have resulted from J.C.'s own physical or medical condition. It was concluded that Father was not being truthful or had disconnected from the harm he caused, and it was determined that his "faking good" scale was elevated, undermining his credibility. Mother, meanwhile, stated she sent her older minor children to live with her sister so she could have more "alone time" with Father after they married. She admitted Father physically abused

her while pregnant, and she was currently pregnant with a third child by him.[4] Like Father, she expressed anger over J.C.'s injuries, and her "faking good" scale was elevated, undermining her credibility. She provided no explanation for waiting a day to bring J.C. to receive treatment after he was injured or for waiting until he was unresponsive. Foster father (Mother's sister's husband) reported that J.C. was attending all his recommended outpatient therapies and appointments and making progress under their care, but his prognosis was unknown. He stated that both J.C. and N.C. could remain with him and Mother's sister in their home for as long as they required substitute care and they were willing to become licensed foster parents for them.

¶ 14    The report concluded that Mother's prognosis for reunification with the minors was poor, citing her delay in obtaining treatment for J.C., having been indicated by DCFS for causing his injuries, and her need to first involve herself in therapy and services. Similarly, Father's prognosis for reunification was also poor, citing his inability to acknowledge any role in J.C.'s injuries, as well as his having been indicated by DCFS for causing them. It was further noted that, if Mother and Father remained together as a couple, future risk to the minors' "safety and wellbeing while in their care would be high." Based on all this, in December 2020, the juvenile court entered adjudication orders (1) finding J.C. neglected due to injurious environment and unrebutted presumption of parental physical abuse and (2) finding N.C. neglected due to injurious environment and abused due to substantial risk of injury.

¶ 15    In February 2021, the matter proceeded to a dispositional hearing. James Bracey, the minors' DCFS caseworker and one of the authors of their integrative assessment report, was the only witness to testify. With respect to Father and his services, Bracey stated that Father was attending individual therapy and had completed parenting classes and coaching but that he had not accepted that J.C. was abused. Bracey noted Father has continually denied being a perpetrator of any domestic violence toward Mother or the minors and, as of the hearing, he had not participated in any domestic violence services and was still refusing any such treatment. With respect to Mother and her services, Bracey testified she likewise had attended some individual therapy and parenting classes, was making progress with a parenting coach, and was receiving services for domestic violence as a victim. Her two older minor children were now living with her. Bracey noted, however, that he did not have any current report on Mother's progress in services. He had tried to reach her counselor before the hearing but had failed to make contact and knew from the counselor at this time only that Mother's services were "ongoing." Specifically, regarding her domestic violence services, Bracey informed the court that he had only that day received Mother's domestic violence services report but had not yet had time to review it. Bracey indicated that the previous report was already two months old, and all he could recollect to the court was that he thought it had "read well"; neither report was entered into evidence. The only service he knew for certain Mother was "making progress" in was parent coaching; Bracey stated he could not testify as to whether Mother had fully completed any other service recommended to her.

¶ 16    Bracey further testified in detail about the order of protection Mother had obtained against Father for herself and the minors after the adjudicatory hearing. Bracey explained, that following that hearing, Mother had been permitted to have visitation with the minors at the

---

[4]For the record, this third child was due to be born in April 2021; this court has no further information with respect to that child.

home of the foster parents, while Father was permitted to have visitation with the minors only at a supervised DCFS office. During this time, Bracey made clear to Father and Father's counsel that, pursuant to the order of protection Mother had obtained, if Father and Mother were to be together at any time, Father would be in violation of that order and subject to arrest. Bracey then noted that soon thereafter, as early as December 2020, Mother dropped the order of protection against Father, even though Father was not engaging in domestic violence services.

¶ 17      Bracey continued his testimony by explaining he spoke to Mother and Father about this and that Mother initially indicated she dropped the order of protection so she and Father could visit the minors at the same time. However, upon further interview, both Mother and Father subsequently admitted to Bracey that they had been anticipating reconciliation for months and did so all the way until at least the Saturday prior to the dispositional hearing, and this was why Mother dropped the order. After learning this, Bracey stated he told Mother's counsel he would not recommend return home if Mother and Father were together and Father had not completed his services, and Mother's counsel told him he would "see to it" that they remained separated. Bracey also spoke to the foster father about the situation, and the foster father told Bracey that from his observations it seemed as if Mother and Father had reconciled and were together. Bracey believed, based on all this and along with his visits and knowledge of the case, that Father and Mother were living together again. Ultimately, with no verification that Mother had completed all her recommended services and with the relationship between Father and Mother unclear, Bracey testified that DCFS recommended the minors be made wards of the court and that DCFS have the right to place them, as this was in their best interests based on the severity of J.C.'s injuries and the need for Father to receive domestic violence services, and that a goal of return home should be set for 12 months.

¶ 18      Following argument, the court issued a dispositional order finding that it was in the best interests of N.C. and J.C. that they be made wards of the court and that DCFS had made reasonable efforts at reunification. Regarding Father, the court concluded he was unable to parent, as he had not participated in domestic violence services. However, regarding Mother, the court concluded that all her reunification services "have been successful." Notably, with respect to the order of protection, the court declared that Bracey's testimony stated Mother dropped it so she and Father could visit the minors together; when both the assistant state's attorney and the Public Guardian alerted the court that this was not Bracey's testimony and that he had instead testified Mother and Father told him Mother did so because they were reconciling, the court responded that its notes "don't reflect that." The court then went on to conclude that Mother had "engaged in all the services" recommended to her and that her older children "are doing just fine" in her care. Accordingly, it declared her fit, willing, and able to care for the minors, and it issued an order of protection stating Father could only have DCFS-supervised visits with the minors and that Mother and Father could not attempt reconciliation unless they first engaged in extensive couple's counseling and Father completed domestic violence services. The court vacated its temporary custody orders, thereby "returning the minors home to the legal custody of" Mother.

¶ 19                                          ANALYSIS

¶ 20      The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2018)) sets forth the procedures and criteria for determining whether to remove a minor from his parents'

custody and make the child a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). In making this determination, the circuit court employs a two-step process. *In re A.P.*, 2012 IL 113875, ¶ 18. First, there is an adjudicatory hearing wherein the court determines whether the minor is abused, neglected, or dependent. 705 ILCS 405/2-18(1) (West 2018); *A.P.*, 2012 IL 113875, ¶ 19. If the court determines that the minor is abused, neglected, or dependent, the court holds a dispositional hearing wherein it determines whether it is in the best interest of the minor and the public for the minor to be made a ward of the court. 705 ILCS 405/2-21(2) (West 2018); *A.P.*, 2012 IL 113875, ¶ 21.

¶ 21     As we noted at the outset of this decision, all the parties make clear in their respective briefs that none challenges the adjudication order entered by the juvenile court here. Accordingly and upon agreement, we need not address on appeal the findings that N.C. and J.C. were neglected and abused, and these will stand. Additionally, no party challenges that portion of the juvenile court's dispositional order finding that it was in the best interests of N.C. and J.C. to make them wards of the court. Accordingly, this determination will stand, as well.

¶ 22     What is at issue is that portion of the dispositional order finding Mother is fit, willing, and able to parent these minors at this time and that portion ordering the minors' immediate return to her legal custody and care. DCFS argues that Mother has shown poor judgment in her duty to protect the minors and cites, in addition to her failure to seek medical treatment for J.C., the uncertainty of her relationship with Father, who has consistently failed to participate in any domestic violence services despite Mother's allegations of physical abuse of her and the minors by him, as well as her own failure to complete services. Likewise, the Public Guardian argues that the evidence presented demonstrates Mother has not substantially completed services essential for reunification and that she dropped the order of protection to reconcile with Father, who has not participated in domestic violence treatment. The State has conceded all these points and, based on the record before us, we, too, agree that reversal of the juvenile court's dispositional order is undeniably warranted here.

¶ 23     Briefly, it is axiomatic that, with respect to any dispositional hearing, the paramount consideration before a court is to be the best interests of the minor. *In re Kelvion V.*, 2014 IL App (1st) 140965, ¶ 23. The court may commit the minor to wardship upon a determination that the parents are unable or unwilling or unfit, for some reason other than financial circumstances alone, to care for, protect, train, or discipline the minor and that the health, safety, and best interests of the minor will be jeopardized if he remains in the custody of the parents. *In re Harriett L.-B.*, 2016 IL App (1st) 152034, ¶ 30. The party seeking a finding of inability or unwillingness or unfitness on the part of the parents—any of which provide a proper basis for removal (*Harriett L.-B.*, 2016 IL App (1st) 152034, ¶ 30)—need only establish as much by a preponderance of the evidence. *Kelvion V.*, 2014 IL App (1st) 140965, ¶ 23.

¶ 24     Juvenile courts are presumed to know and have applied the law properly in the matters before them; however, this may be affirmatively rebutted by the record, particularly where a dispositional decision is based on an erroneous interpretation of fact. See *In re Marianna F.-M.*, 2015 IL App (1st) 142897, ¶ 41 (such judgments are "subject to keener scrutiny by a reviewing court"). As a reviewing court, we may reverse a dispositional order if it is contrary to the manifest weight of the evidence, which occurs "when the record demonstrates that 'the result opposite to that reached by the trial court was the proper result.' " *Kelvion V.*, 2014 IL App (1st) 140965, ¶ 23 (quoting *In re Stephen K.*, 373 Ill. App. 3d 7, 25 (2007)); see *Harriett L.-B.*, 2016 IL App (1st) 152034, ¶ 30. And, ultimately, reversal of a dispositional order may

occur where it is found that the juvenile court abused its discretion by selecting an inappropriate dispositional order based on the evidence before it. See *Kelvion V.*, 2014 IL App (1st) 140965, ¶ 23; see also *Harriett L.-B.*, 2016 IL App (1st) 152034, ¶ 30 (citing *In re Kamesha J.*, 364 Ill. App. 3d 785, 795 (2006)); see, *e.g.*, *Marianna F.-M.*, 2015 IL App (1st) 142897, ¶ 43 (reversing lower court's dispositional order of immediate return home as against manifest weight of the evidence where it was found that the juvenile court abused its discretion by basing its conclusions on an erroneous interpretation of the testimony presented before it).

¶ 25    With the State's concession of the issue at hand, we write only at this point to further emphasize our tandem support of reversal here. Suffice it to say, based on the record before us, we hold that the juvenile court's conclusion that Mother is fit, willing, and able to parent these minors is clearly against the manifest weight of the evidence and that its decision to order immediate return home to her is an abuse of its discretion.

¶ 26    The central focus of this cause must be, always, J.C. and N.C. It is undisputed that J.C., at the age of three months, suffered indescribable injuries that were, to put it mildly, very severe. Mother and Father did not seek care for him upon his latest injury; they waited until the next day and only when he became unresponsive. It was then discovered that, in addition to the incident that required hospitalization, he had multiple other injuries that were in different stages of healing; again, J.C. was only three months old. These included bone fractures, head and facial bruising, and various hemorrhages, which led to a stroke. His injuries were so serious that the hospital he was brought to could not provide the level of care he needed. Following a lengthy hospital stay, J.C. required rehabilitation and extensive therapies. Ultimately, it remained undisputed throughout this cause that J.C.'s doctors determined his injuries comprised "non-accidental trauma," there was "no plausible alternative accidental or medical diagnosis" to explain his injuries, and, pursuant to his doctors' diagnoses, he was at "risk of repetitive and escalating abuse, including death" if he remained in Mother or Father's care.

¶ 27    Next, it was never determined here which parent abused J.C. Mother and Father repeatedly denied abuse, either at their hands or anyone else's, to hospital personnel, DCFS workers, and even police. They instead insisted, contrary to all medical evidence, that J.C. must have an illness that caused his injuries. Later, Mother described that she may have injured him while laying him in his bassinet. It was not until after that (and at a police station) when she finally reported the incident at hand and potential past abuse. Father, meanwhile, countered and claimed Mother, who was J.C.'s primary caretaker, shook him multiple times. The truth regarding the perpetrator and origin of J.C.'s injuries went unexplained before the juvenile court and still remain as such today. Yet, as the juvenile court itself specifically found at the adjudicatory hearing, there is an unrebutted presumption of parental physical abuse here—a finding, again, that remains undisputed, as no party, not even Mother or Father, challenges it on appeal.

¶ 28    Also of critical import and contrary to the trial court's findings, there was no evidence presented regarding Mother's progress in services or whether she had substantially completed any of them. According to its recital of the evidence, the principal basis for the juvenile court's finding of Mother's fitness and its decision of immediate return home was that she had "engaged in all the services" recommended to her and that all her reunification services "have been successful." However, this was not the evidence presented during the dispositional hearing at all. Caseworker Bracey, the only witness to testify, specifically stated he did not have any current report on Mother's progress in services. He testified she had attended some

individual therapy, parenting classes, domestic violence victim services, and parent coaching, but he knew for certain only that she was "making progress" in the parent coaching. He never testified that she completed any of her recommended services or that she did so "successfully," as the trial court declared. Rather, he recounted for the court that the only information he had from Mother's counselor was her services were currently "ongoing," and he had not yet reviewed her domestic violence services report, which he had just received that morning. Of note, the trial court did not seek to have Bracey review that report and did not itself examine it (nor the one prepared two months earlier) before making its rulings. As Bracey was the only witness, his testimony with respect to Mother's services—the completion of which he clearly stated was unknown—remained unrebutted and hardly provided a viable basis for the juvenile court's findings and orders here.

¶ 29        Finally and in most direct contradiction to the clear evidence presented, are the juvenile court's comments and considerations surrounding Mother's dropping of the order of protection she had obtained on her and the minors' behalf after admitting Father's domestic violence against them. In rendering its decisions, the court repeated, more than once, that "Mr. Bracey's specific testimony" was that Mother dropped the order so she and Father could visit the minors together. When both the assistant state's attorney and the Public Guardian interrupted the court to alert it that this was not correct, the court responded that its notes "don't reflect that" but instead that she did so in response to Bracey's indication to her that the parents could not visit the minors together. Yet the record evidence unmistakably shows that the trial court's recollection (which formed the basis of its decisions) was wholly incorrect. Bracey testified that, in the integrative assessment, Mother (finally) admitted Father had committed domestic violence against her and the minors, even while she was pregnant, and had threatened to kill them. After she obtained the order of protection, Bracey spoke with Father and Father's counsel simply to clarify and remind them that, pursuant to that order, Father could not be with Mother or else he would be subject to punishment. Soon thereafter, Mother dropped the order. When Bracey spoke to them both about this, Mother initially told him she did so in order that the parents could visit the minors together, but later, both Mother and Father admitted Mother dropped the order so they could reconcile. Indeed, Mother and Father admitted to Bracey that, from soon after the adjudication hearing to as late as the Saturday before the dispositional hearing, they were anticipating reconciliation—over a matter of months—and this was the real reason why Mother dropped the order. Bracey further testified that, upon obtaining this information from the parents, he spoke with the foster father, who stated his belief, from viewing both Mother and Father during this period, that they were together. From all this, along with his own observations and work on the matter, it was Bracey's opinion, as the minors' caseworker, that Mother and Father were again in a relationship and he could not recommend a return home.

¶ 30        Not only was Bracey's testimony contrary to the juvenile court's findings of fact on their face, but its broader implications further render the court's decisions here untenable. Again, Bracey was the only witness to testify. No one and no evidence presented at the dispositional hearing even remotely rebutted his testimony to suggest that Mother was fit to parent or that return to her care at this time was a recommended option for the minors. Next, it is of note that Mother dropped the order of protection soon after Bracey reminded Father and Father's counsel that, if Father and Mother reconciled with the order in place, Father would be subject to punishment under it. Moreover, it was Bracey's opinion that Father and Mother had

reconciled based on his observations and on his conversations with the foster father, who likewise believed from his own interactions with them that they were together. Further, the juvenile court's interpretation is seemingly unsupported by any real logic. That is, Mother had the right to visit the minors in the comfort and familial setting of her sister's home, where they were living. Father, however, could only visit the minors supervised by DCFS at certain times and at an appropriate office. It is illogical to believe Mother would choose to drop the order of protection for the sole purpose, as the trial court "recollected," to visit the minors jointly with Father in that environment if Mother and Father were not also actively contemplating reconciliation, which they both admitted to Bracey. And it cannot be forgotten that Father has yet to admit to domestic violence (and J.C.'s injuries) or participate in any domestic violence services. All of this supports Bracey's testimony about what Mother and Father admitted to him and runs counter to the accuracy of the juvenile court's supposed "notes": Mother dropped the order of protection not so she and Father could visit the minors together but so they could reconcile—something they had been planning for months up until at least the Saturday before the dispositional hearing and in light of the fact that Mother was pregnant by Father again (which, incidentally, has never stopped his domestic abuse before).

¶ 31     This is not the first time our review of dispositional matters involving minors diverges from a juvenile court's decision, and it will not be the last. This is especially true, again, when the interpretation of facts is central to the matter at hand. See *Marianna F.-M.*, 2015 IL App (1st) 142897, ¶¶ 40-43 (dispositional order of fitness and return home required reversal where juvenile court based its judgment on an erroneous interpretation of fact, including its mistaken recollection that DCFS caseworker had recommended return home when her testimony was clearly that the minor should not be). And it is true even more so where, as here, there is an unrebutted, unchallenged presumption of parental physical abuse. Ultimately, we can only stress that the Act requires juvenile courts to "act affirmatively, and perhaps at times aggressively, to ferret out information" when a minor's best interests are before them. *In re Patricia S.*, 222 Ill. App. 3d 585, 592 (1991) (juvenile court "cannot sit passively and await the parties' presentation of evidence"). In the instant case, in light of the record before us, we cannot say that was done. See, *e.g.*, *In re J.W.*, 386 Ill. App. 3d 847, 856-57 (2008) (where child received numerous injuries while living with parents, parents refused to explain their origin, and parents failed to complete recommended services, dispositional order declaring their unfitness and preventing immediate return home was proper); *Kamesha J.*, 364 Ill. App. 3d at 795-96 (fitness and return home not appropriate options following dispositional hearing revealing the parent had participated in only some recommended services and sought to reconcile with abusive partner).

¶ 32     We address one final matter with respect to this cause. At the outset of our decision, we noted that Father filed a brief in this matter. In it, he insists only that the juvenile court's dispositional order finding Mother fit and ordering immediate return home to her custody was proper and "must stand." Interestingly, he does not appeal from the court's order finding *him* unfit. Moreover, he devotes almost half of his terse brief to discussing the adjudication hearing, from which no appeal was taken in this cause, and the other half to quoting portions of the juvenile court's findings from the dispositional hearing and stating simply that its decision was "reasoned" and "well crafted" toward family reunification.

¶ 33     Without any viable citations of the record or true legal argument beyond the presentation of boilerplate legal principles, we cannot seriously consider Father's brief. He presents no

record facts to support his assertions, he fails to address any of the arguments presented by opposing counsel in their opening briefs, and he makes only conclusory statements in favor of affirmance. Additionally and most significant, his entire argument, if one can be fashioned from his brief, rests on his insistence that the trial court's holding was correct—which we have concluded here was not, as it was based on the erroneous interpretation of the facts presented, namely, Bracey's unrebutted testimony. Nowhere does Father demonstrate how, contrary to Bracey's testimony, Mother is fit and/or has completed services to render her so; he also ignores completely any mention of the order of protection, his and Mother's reconciliation, and his failure to acknowledge domestic violence and participate in any such services, all of which are so central to this cause. And the irony of Father's contentions does not escape us here. Father maintained throughout this litigation that, if someone injured J.C. (as the juvenile court declared was true at the adjudicatory hearing), it had to be Mother, since she was his primary caretaker and since he had seen her shake him on multiple occasions, as she, in his words, gets "crazy sometimes." He has never withdrawn this accusation against Mother, and he still maintains he did not cause J.C.'s injuries. Inherently, he admits Mother abused J.C. We cannot understand then, why, if he truly has the minors' best interests at heart, he would argue now in our court that the juvenile court's decisions finding her fit and returning them immediately to her care are proper. It is simply illogical. Ultimately, as Father's brief presents nothing but conclusory statements, which we have already found to be unsupported by the record evidence here, we are at a loss as to how, especially in light of opposing briefs, he could otherwise persuade us to uphold the juvenile court's erroneous orders. See, *e.g.*, *Pilat v. Loizzo*, 359 Ill. App. 3d 1062 (2005) (mere conclusory assertions in appellate brief result in waiver of claims on appeal).

¶ 34                                    CONCLUSION

¶ 35        Accordingly, for all the foregoing reasons, we reverse and vacate those portions of the juvenile court's dispositional order finding Mother fit, willing, and able to parent the minors and ordering their immediate return to her care and custody, and we remand the cause to the court with directions that it enter a new dispositional order finding Mother unable to parent the minors at this time and ordering them to be placed in the custody of the DCFS guardianship administrator.

¶ 36        Reversed in part, vacated in part, and remanded with directions.