2020 IL App (1st) 191293

Nos. 1-19-1293 & 1-19-1402 (Cons.)

May 26, 2020

First Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF LENA S., | ) | Appeal from the |
| | ) | Circuit Court of |
| Minor-Respondent-Appellant and Appellee, | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | No. 17 JA 988 |
| Petitioner-Appellee, | ) | |
| v. | ) | Honorable |
| Amanda S., | ) | John Huff, |
| Mother-Respondent-Appellant and Appellee, and | ) | Judge Presiding. |
| Joseph B., | ) | |
| Father-Respondent-Appellee.) | ) | |

JUSTICE WALKER delivered the judgment of the court, with opinion.
Presiding Justice Griffin and Justice Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1     The trial court entered a dispositional order finding Amanda S. and Joseph B. unfit to parent their

daughter, Lena S. Lena and Amanda, with the support of the State of Illinois, argue on appeal that the

finding of unfitness for Amanda is contrary to the manifest weight of the evidence. We find that the

trial court had no sufficient grounds for rejecting the opinions of all the experts, as well as the witnesses

who knew the family best. We reverse the trial court's dispositional order and remand for entry of an order finding Amanda fit to parent Lena and returning Lena to Amanda's custody.

¶ 2                                    I. BACKGROUND

¶ 3    Amanda S. had a daughter, Brittany S., before she met Joseph B. in 2001. Amanda married Joseph in 2003 but left Joseph two weeks after the wedding due to Joseph's domestic violence. A court entered a restraining order directing Joseph to stay away from Amanda in 2003. Amanda gave birth to their daughter, Lena, on February 6, 2003. A North Carolina district court in 2004 awarded primary custody of Lena to Amanda and secondary custody to Joseph.

¶ 4    Amanda involved herself in a new relationship in 2003, and in the course of that five-year relationship she gave birth to a son, Dalton S., in 2005. Amanda began a relationship with Justin W. in 2008. When Justin came to her home under the influence of drugs, she told him to leave, and he assaulted her. She obtained a court order to protect her and her children from Justin.

¶ 5    In March 2010, Joseph filed a motion asking the North Carolina court to find Amanda in contempt for preventing him from visiting Lena. At the hearing on Joseph's motion, Justin testified that, after Amanda obtained the order of protection against him, he continued to live with Amanda. The North Carolina district court summarized the consequences of Justin's return to Amanda's home:

> "[O]n October 6, 2009, arrest warrants were again issued against Justin *** for one count of Assault on a Female against [Amanda,] the Defendant[,] and one count of Assault on a Child Under 12 [, Lena] ***.
>
> *** [T]he warrants allege that Justin *** grabbed the mother by the neck, punched her in the face, and that he assaulted the minor child by grabbing her arm and shoving her out of the way so he could continue to assault her mother."

¶ 6 Justin pled guilty to the charge of assaulting Amanda, and the State dismissed the charge of assaulting Lena. The North Carolina district court heard evidence that Justin returned to Amanda's home once in 2011 and that on that occasion a neighbor shot Justin. Justin's probation officer could not find him after his release from jail in December 2012, until a call told her to look to Amanda's home for Justin. The call led to Justin's apprehension.

¶ 7 The North Carolina district court found:

> "[T]he father spoke to Ms. Moore directly and indicates that he need[s] to work with a counselor on being patient due to his explosive anger problem, and admitted to using inappropriate references to the minor child about her weight.
>
> * * *
>
> *** [T]he father maintains***that he has only put his hands on his daughter as a disciplinarian twice [in her] life.
>
> *** Defendant never informed the minor child's therapist, Ms. Moore, that [Justin], the man the children call 'dad,' was shot in their apartment complex.
>
> *** [D]uring this hearing, the Defendant was less than forthcoming with the Court when she testified that she moved out of that apartment complex the month after there had been a shooting in the area, but failed to disclose that it was her former boyfriend and the man the children called 'dad.'
>
> *** [T]he Court is also concerned that over the past five years, the mother reported seven separate places she has lived with her minor children, and five separate schools the minor child has attended; and that of a related concern there are periods of time up to six months that are not accounted for in the Defendant's testimony as to where she was living.

* * *

*** Defendant has been dishonest and inconsistent in her reports to [the North Carolina Department of Social Services (DSS)], the Jacksonville Police Department, Ms. Moore, and/or this Court.

*** [O]f perhaps the greatest concern to the Court, is that the Defendant failed to disclose to Ms. Moore that the minor child had not only been a witness to domestic violence against the Defendant and the minor child's siblings, but that the minor child had herself been [a] victim of domestic violence at the hands of Justin

***, the man she calls 'dad' ***.

* * *

*** [D]efendant has alienated the minor child from the father by manipulating facts, and her failure to take action to reassure the minor child that her anxiety about her father is unwarranted.

***

*** Ms. Moore reported that the minor child disclosed to her that 'Dad gets angry and beats her' however there are no criminal charges or evidence as to any specific events wherein the minor child has suffered any abuse at the hands of her father."

¶ 8    The North Carolina district court entered an order in 2014 transferring primary custody of Lena from Amanda to Joseph, with supervised visitation for Amanda. In 2014, Joseph brought Lena to live with him in Illinois. In 2015 Joseph filed a motion in North Carolina asking the court to hold Amanda in contempt for "bad faith conduct and manipulation of the minor child."

¶ 9    Joseph's contempt motion remained unresolved in June 2017. On June 26, 2017, Lena and Joseph spoke with Joseph's mother, Lori G. During that conversation, Joseph admitted that he struck

Lena. After a discussion with Lori, Joseph signed a document stating that, if Joseph hit Lena again, Lena would leave the home and contact Lori, who would help Lena get to Lori's home in Utah.

¶ 10   Lena sought Lori's help less than three months later. On September 22, 2017, Lena called Lori from school and told Lori that Joseph hit her that morning. The Illinois Department of Children and Family Services (DCFS) took Lena into protective custody that day. The Illinois circuit court awarded DCFS temporary custody on September 26, 2017. DCFS placed Lena in the home of Joseph's sister, Christina B.

¶ 11   On September 27, 2017, Christina filed a petition for an order of protection and no contact, on behalf of herself and Lena. The circuit court had not heard Christina's petition by October 31, 2017, when the State of Illinois filed a complaint charging Joseph with battery of K.M., the 14-year-old sister of Joseph's paramour.

¶ 12   Christina and Lena testified in the circuit court on November 7, 2017, in support of Christina's motion for an order of protection. After the hearing, the circuit court awarded a two-year plenary order of protection severely restricting Joseph's contact with Christina and Lena.

¶ 13   In November 2017, the North Carolina district court entered an order resolving Joseph's petition for a finding of contempt against Amanda. The North Carolina district court ruled:

> "Defendant's conduct has aggravated the situation. Her daughter did threaten to harm herself immediately upon the return to Chicago from Christmas 2014 visitation. Defendant violated court ordered supervision of her contact with the daughter by encouraging and enabling secret communication with the child. Defendant encouraged the child to use one of the Plaintiff's Chicago neighbors to facilitate unauthorized contact with the Defendant ***.

* * *

*** Defendant has acted in violation of the prior order and contrary to the best interests of the minor child by participating in secret communications with the child not permitted by the child's therapist and by *** undermining Plaintiff's effectiveness as the parent with primary custody of the child.

* * *

*** [T]he minor child's best interests would be served by remaining in the primary custody of Plaintiff but with contact with Defendant being less restrictive and returning to a more normal or typical visitation schedule."

¶ 14    Although the court found Amanda in contempt and imposed a fine of $1000, the court increased Amanda's visitations with Lena and contained fewer restrictions than those imposed by the court's prior order.

¶ 15    In the battery case, the Illinois circuit court sentenced Joseph to 24 months' supervision starting in January 2018 and ordered him to avoid K.M.

¶ 16    The Illinois circuit court heard testimony in support of the State's petition for adjudication of wardship. The court accepted into evidence a transcript of Lena's testimony on Christina's petition for the order of protection. Lena testified about the events of September 22, 2017, that started at 5 a.m.:

"[Joseph] woke me up, started talking to me and slapped me in my face.

* * *

He made me lift weights above my head. I dropped the weights on my knee, my fingers, and then I hurt my shoulder. And he told me to deal with it. And then I kept telling him I couldn't do it. So then he grabbed—we had cabinets in the garage. So he pushed me up against it, grabbed my face and started shaking my face and yelling at me and telling me I have to do what I got to do or he's just going to make it worse and my

life is going to be worse. And then he stopped and told me to go run in the front yard, in the front on our sidewalk. I did that, and he said I wasn't doing it right. So then he took me back in the garage to do more exercise ***, and then after that, he made me go inside, take a shower, get ready for school, and I went to school.

* * *

*** So then I called my grandma on my friend's phone [and] told her what he did to me that morning. And within 15 minutes of me being in school, I got checked out. And Dad checked me out and we went home. And then he didn't really talk to me at all, but he made me stand against the wall with my head above the wall for a couple of hours."

¶ 17    The DCFS investigator who spoke with Lena on September 22, 2017, testified that when she took Lena into DCFS custody Lena said, "I just can[']t believe that this is true. I'm finally away from him. *** I'm just glad that I'm safe now."

¶ 18    Lori testified that on June 26, 2017, she saw that Lena had a bruise and the side of her face was red. Lena said that she hurt herself on a Slip 'n Slide. Lori asked Joseph about the injury, and he said Lena's "behavior was out of control and that she kept lying to him, so he wound up slapping her ten times in the face." The encounter led to the signed agreement that Lori would help Lena run away if Joseph struck her again. Lori testified that Joseph frequently got angry with Lena and used foul language as their relationship deteriorated through July, August and September of 2017. Lori brought Lena to Utah for a vacation in August 2017.

¶ 19    Joseph testified that when he and Amanda allowed Lena to visit Lori in August 2017, Joseph expressly demanded a letter from Lena "so that we could negotiate about Lena's mental stability to keep her on the right path." Lena told him she wrote the letter but lost it. According to Joseph, Lena

said "she'll just take whatever consequence for it because she's not redoing it." He admitted that he spanked Lena three times, using a belt, because she repeatedly lied.

¶ 20    Amanda testified that, before Lena's vacation in Utah, Joseph told Lena "to write a letter, an apology letter to me and him and then also write a letter of why she told the Judge she wanted to live with me." Neither Amanda nor the court had requested any such letter.

¶ 21    Joseph's paramour testified that Lena did not fear Joseph. Joseph's therapist, Diane Kapp, who saw Lena in therapy sessions several times, also saw no signs of fear from Lena. Kapp admitted that Lena did not open up to her when they met without Joseph. She said Lena "has a very high IQ." Kapp knew about the corporal punishment, which she considered inappropriate, and she had seen some of Lena's bruises. Kapp did not think that the corporal punishment amounted to abuse.

¶ 22    Lena's guardian *ad litem* asked the court to permit Lena to testify in chambers, so that she would not need to confront Joseph directly. The court denied the motion. Lena did not testify at the adjudication hearing.

¶ 23    The Illinois circuit court held:

> "[T]he corporal punishment that was administered by [Joseph], in my opinion, was proportional to the infractions that his daughter committed. She consistently lied. She told her classmates at school that she had been raped. That her mother had been raped. That her brother had been raped. She lied about doing chores around the house. She refused to do chores around the home.
>
> ***
>
> And the testimony that I found credible was that he slapped his daughter three times over a period of about two or three years.
>
> ***

*** [C]orporal punishment is permitted in the State of Illinois provided that it does not cause serious injury to the child, provide[d] that it is not administered out of anger or lashing out at the child. And in this case there's been no evidence that there was any serious injury to the child.

\* \* \*

*** I do find that the minor was in an injurious environment. *** She repeatedly told the father as well as his paramour that she did not want to be here, that she wanted to go back to North Carolina to her mother.

*** [T]he fact that the parents were divorced very shortly after she was born, the fact that there *** seemed to be an ongoing battle between her parents, no doubt inflicted over the years extreme anxiety in this child."

¶ 24    Prior to the dispositional hearing, the court accepted a letter from Lena in evidence:

"The reason why I didn't testify the first time was because I was afraid that if I talked in front of my dad[, h]e would yell at me or hit me.  Like one time he thought I was l[y]ing and started slapping me in the face hard. He left bruises on my face and my grandma asked me what happened and he made me lie. ***

*** I believe I'm responsible to make good decisions. My mom has always had my back and appreciated me ***. I don't want to miss out on more. I want to see my brother, nephews, niece grow up. *** My mom will never abuse me mentally or physically. I don't want to be forced to see my father, because that will only push me away more. I still have so many emotions towards him that I'm not ready to see him."

¶ 25    The case manager for DCFS testified at the dispositional hearing that Christina provided a safe and appropriate home for Lena. Amanda participated in all the services DCFS recommended for her. Amanda completed parenting classes successfully, and she continued to progress in therapy. DSS in North Carolina approved Amanda's home as an appropriate environment for her children. DCFS recommended returning Lena to Amanda's custody.

¶ 26    On cross-examination the case manager admitted that, in the integrated assessment, DCFS recommended that the case manager should obtain full medical records of Lena's psychiatric hospitalization. The case manager admitted that she had not succeeded in obtaining the necessary court order for the records. She also could not obtain a court order for Lena's educational records for the years before DCFS took custody of her.

¶ 27    The court accepted into evidence a report from the therapist treating Lena in North Carolina. The therapist's report provided:

> "This therapist has seen no indication that client is an unfit mother based upon therapist's observations of children and grandchildren when mother came for appointments (*i.e.* their appearance, dress, behavior around client, etc.)
>
> *** It is this therapist's recommendation that [Lena] be returned home to live with her mother, brother and be in close proximity to her supportive maternal grandmother, her older sister and be able to see her nephew and niece.
>
> *** [Amanda] met her therapeutic goals of being cooperative, engaging in therapy, attending therapy, obtaining employment, and improving her self esteem and self worth.

It is my sincere hope that this nightmare can finally end for client and her family, that Lena can return home, and that this family can begin the process of healing and getting back to being a complete family again."

¶ 28    Christina testified:

"[W]hen Lena was initially placed in my home, *** she was very afraid. *** For instance, I wanted to go out of state with her and take a vacation and she was very afraid of that location because she said her father's been there several times and she didn't want to take the chance of running into him out of state."

¶ 29    Amanda helped Christina when Christina had difficulties parenting Lena. Christina testified:

"I do not believe her mother has swayed Lena one way or the other about seeing her father.

*** I've asked her, you know, point[-]blank, what are you afraid of, she has said that he would say mean things to her or physically hurt her. Like, he would get up and hit her ***.

* * *

I think it's in Lena's best interest that she reunify with her mother as soon as possible.

* * *

*** I think Lena is closest to her mother and feels safe and trusts her mother and I think that that relationship is very vital for her. I think that Lena is old enough to make a choice about who she wants to live with and I believe that *** her family in North Carolina will support her and I believe they will have her best interest at heart going forward."

¶ 30    Crystal C., who married one of Joseph's closest friends, testified that Joseph permitted Lena to stay overnight with Crystal's family but that he set stringent limits. Crystal testified:

> "He told me how she wasn't allowed to go outside to play. She wasn't allowed to watch TV. She's not allowed to call her mom. ***
>
> * * *
>
> *** She was wearing a mens white T-shirt and mens sweatpants. I'm like, she didn't have anything nicer for her to wear for a family party? *** And he told me *** that she's too fat, and she won't have nicer things until she looks nice."

¶ 31    Crystal also reported that when Joseph coached Lena's volleyball team, "she'd be running it while the rest of the girls were playing. And during the entire time they were supposed to be practicing, Lena would be running the court."

¶ 32    Joseph's cousin, Sean C., testified that Amanda called Sean's wife asking Sean and his wife to contact DCFS about Lena. Sean testified, "over a couple of months *** she would repeatedly call and asking with *** like a new mark or a new bruise that Lena was telling her, and she needed people to open up these cases." Sean also testified that his wife took pictures of some of the bruises. Sean went to Joseph's home three times, and he did not see any indication that Joseph abused Lena. Sean testified that, after Lena returned from a Thanksgiving visit to North Carolina, Sean's daughter told him Lena said she might be pregnant, although she did not remember having sex.

¶ 33    At the dispositional hearing in 2019, when Lena was 16, Joseph testified that he discussed with Amanda how to handle Lena's refusal to speak with him. Joseph testified:

> "I said, Amanda, if I was you, I'd bust her little ass, that she's going to sit there and tell you that, no, she's not going to talk to her father. ***

I don't think at Lena's mentality, that she should have the option of saying, I don't want to talk to one parent or another because her mentality is not that of a 16- year-old."

¶ 34    Christina sent Joseph a text on Lena's sixteenth birthday, telling him Lena wanted to speak with him in a supervised call. Joseph testified, "I sent her back a text, don't bother calling me; I will not be supervised to talk to my daughter."

¶ 35    The trial court explained the findings that support its dispositional order:

"It is my opinion that [Amanda] needs to undergo additional extensive domestic violence counseling as a victim.

* * *

***[The] District Court in North Carolina on November 21st of 2017, the Court suspended mother's visitation with Lena because she had caused Lena to threaten to harm herself in order to regain custody of Lena. The Court reiterated the prior findings *** that had been made in 2014 that [Amanda] was intentionally alienating Lena from her father by manipulating the truth, by secretly communicating with Lena, and by undermining [Joseph] as the parent with primary custody of Lena. ***

As to all of these deficiencies of [Amanda], this Court is not *** satisfied that these deficiencies in [Amanda]'s parenting skills and practices have been addressed or remedied. ***

* * *

Another factor that this Court considered is that following a lengthy holiday visit to her mother's home during the pendency of this case, Lena came back home and told one of her friends that she believed she was pregnant. That statement was a red flag to

me. It indicated to me that [Amanda] either would not or could not properly guide, aid, and supervise her daughter if Lena were to be returned home to her."

¶ 36    The circuit court found both Joseph and Amanda unfit to parent Lena, and it [left Lena in Christina's custody. Lena and Amanda filed separate notices of appeal. We consolidated the appeals. The State adopted Lena's brief and joins her argument for reversal of the circuit court's judgment. Joseph asks us to affirm the judgment finding both parents unfit.

¶ 37                                   II. ANALYSIS

¶ 38    On appeal, Lena argues that the circuit court erred by finding Amanda unfit to parent Lena. We apply the manifest weight of the evidence standard to the circuit court's finding of unfitness. *In re April C.*, 326 Ill. App. 3d 225, 238 (2001). "Where a circuit court's discretion has been exercised based on an erroneous interpretation of fact, its decision is subject to keener scrutiny by a reviewing court." *In re Marianna F.-M.*, 2015 IL App (1st) 142897, ¶ 41.

¶ 39    The Juvenile Court Act of 1987 provides:

> "The purpose of this Act is to secure for each minor subject hereto such care and guidance, preferably in his or her own home, as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community; to preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal; *** and, when the minor is removed from his or her own family, to secure for him or her custody, care and discipline as nearly as possible equivalent to that which should be given by his or her parents." 705 ILCS 405/1-2(1) (West 2018).

¶ 40    All of the therapists and counselors who treated Amanda and Lena found Amanda fit to parent Lena. Amanda participated successfully in all services DCFS recommended. Compliance with DCFS recommendations constitutes a significant factor favoring a finding of fitness. See *In re Chelsea H.*, 2016 IL App (1st) 150560, ¶¶ 89-90. "[W]hen a judge rejects expert testimony, 'there must be some basis in the record to support the conclusion that [that] evidence…is unworthy of belief.' " *In re Application of L.L.*, 653 A.2d 873, 883 (D.C. 1995) (quoting *Rock Creek Plaza-Woodner Ltd. Partnership v. District of Columbia*, 466 A.2d 857, 859 (D.C. 1983)). "Where, as here, the expert testimony was unrebutted, we accord only 'limited deference' to a trial court judgment rejecting it." *L.L.*, 653 A.2d at 883 (quoting *D.C. Transit Systems, Inc. v. Simpkins*, 367 A.2d 107, 109 (D.C. 1976)). "[T]he trial court could not reject the expert's conclusion without other testimony or evidence that defendant was fit ***." *People v. Baldwin*, 185 Ill. App. 3d 1079, 1087 (1989) (finding of fitness to stand trial is contrary to the manifest weight of the evidence when expert testimony that defendant is not fit stands uncontradicted).

¶ 41    The circuit court relied on several erroneous findings of fact. The circuit court found, "[the] District Court in North Carolina *** suspended mother's visitation with Lena because she had caused Lena to threaten to harm herself in order to regain custody of Lena." The finding errs in two ways: the North Carolina court never found that Amanda caused Lena to threaten to harm herself, and more significantly, the North Carolina district court ordered an expansion of Amanda's visitation with Lena, not a suspension of that visitation. The Illinois circuit court found Lena lied when she said her mother had been raped, but other evidence in the record shows that Amanda had in fact been raped. The testimony of Lori, Christina, and Sean shows that Amanda did not manipulate the courts or others to produce the bruises that led Amanda and Lena to seek protection from Joseph. The finding that Amanda needed domestic violence counseling conflicts with the recommendations of DCFS and ignores the

record, which shows no evidence of any incidents of domestic violence involving Amanda since 2009. No evidence showed any contact with Justin since 2013, more than six years prior to the finding of unfitness. Even if the old domestic violence could provide some limited support for the finding of unfitness, the "presumption is not permanent; it weakens over time." *In re Edricka C.*, 276 Ill. App. 3d 18, 28 (1995). The North Carolina district court did not find Amanda unfit to parent Lena, even when the court transferred custody of Lena from Amanda to Joseph. The court never suggested that the State should take custody of Dalton, Amanda's other minor child.

¶ 42    Most notably, the circuit court completely ignored the testimony of the two witnesses who knew Joseph best: his mother and his sister.  Joseph's mother helped Lena get out of Joseph's home to a place of safety. Joseph's sister, Lena's foster mother, who testified that she turned to Amanda when she needed help with parenting Lena, unequivocally recommended returning Lena to Amanda's custody.  Like the court in *J. v. M.*, 385 A.2d 240, 248 (N.J. Super. Ct. App. Div. 1978), "[w]e disagree with the trial judge's rejection of the uncontradicted expert testimony in the case." We reverse the finding of unfitness and remand to the circuit court for the entry of an order transferring the custody of Lena, for the last few months of her childhood, to Amanda.

¶ 43                                III. CONCLUSION

¶ 44    The finding of unfitness, that was based on a few incidents that occurred more than a decade before entry of the dispositional order and ignores all the experts and the opinions of the witnesses who knew the family best, is contrary to the manifest weight of the evidence. We remand to the circuit court for entry of an order finding Amanda a fit parent for Lena and returning Lena to Amanda's custody.

¶ 45    Reversed and remanded with directions.

**No. 1-19-1293**

| | |
|---|---|
| **Cite as:** | *In re Lena S.*, 2020 IL App (1st) 191293 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-JA-988; the Hon. John Huff, Judge, presiding. |
| **Attorneys for Appellant:** | Charles P. Golbert, Kass A. Plain, and Jean M. Agathen, of Office of the Cook County Public Guardian, of Chicago, for the minor. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Gina DiVito, Assistant State's Attorneys, of counsel), for the People. |
| **Attorneys for Appellee:** | Elizabeth Butler, of Northbrook, for Joseph B. |